IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DCCC,<br>430 South Capitol St SE<br>Washington, DC 20003,<br><br>                    Plaintiff,<br><br>          v.<br><br>FEDERAL ELECTION COMMISSION,<br>1050 First Street NE<br>Washington, DC 20463,<br><br>                    Defendant. | Civil Action No. _____<br><br><br>**Preliminary Injunction and FRCP 65(a)(2)**<br>**Consolidated Merits Hearing Requested** |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff DCCC, on its own behalf, and on behalf of its members, constituents, and voters, by and through its undersigned attorneys, file this Complaint for Injunctive and Declaratory Relief against Defendant for violations of the Administrative Procedure Act. Plaintiff further seeks a preliminary injunction and a consolidated merits hearing under Federal Rule of Civil Procedure 65(a)(2). Plaintiff alleges as follows:

### NATURE OF THE CASE

1.     In July 2024, the National Republican Senatorial Committee ("NRSC") began relying on a flawed reading of an agency regulation in order to circumvent statutory limits that Congress has placed on coordinated spending between political parties and their candidates. The result is that the NRSC is spending *tens of millions of dollars* on television advertisements to expressly advocate for the election of Republican candidates in full coordination with those candidates. This spending far exceeds the limits set forth in federal law and is illegal. As such, the NRSC and Republican candidates should be on the hook for large fines and penalties. But the

Federal Election Commission ("FEC"), the agency charged with interpreting how federal campaign finance law applies in specific situations like this one, has wholly failed in its duty to render an advisory opinion as to whether such spending is permissible.

2.      The FEC's failure has left DCCC between a rock and a hard place on the eve of the November election. It may adhere to federal law, as it best understands it, but in doing so must sit on its hands while Republicans invest tens of millions of dollars into arguably illegal television advertisements. Alternatively, DCCC may mimic this newfound tactic, but at the risk of exposing itself and its participating candidate committees to future enforcement—including felony criminal prosecutions brought by the U.S. Department of Justice ("DOJ") and/or serious civil sanctions sought by the FEC or third-party complaints.

3.      The FEC has the duty to grant advisory opinions that resolve such ambiguities in accordance with federal campaign finance statutes. The FEC's advisory opinions are critical to regulated political actors because, by relying on such opinions, they are granted safe harbor protections from enforcement. 52 U.S.C. § 30108(c). The FEC's failure to provide guidance on this question, or alternatively offer safe harbor protections, violates the Administrative Procedure Act ("APA"), because the failure was contrary to federal campaign finance laws.

4.      The underlying dispute is straightforward. Under the Federal Election Campaign Act of 1971, as amended ("FECA"), when a party committee (like DCCC) makes an expenditure in "cooperation, consultation, or concert" with "a candidate" for office, such an expenditure "shall be considered to be a contribution to such candidate." 52 U.S.C. § 30116(a)(7)(B)(i). Congress has placed strict limits on contributions from national party committees to candidates. *See id.* § 30116(d).

5.      Republicans, however, say they have found a workaround. They are using the FEC's joint fundraising regulations to permit a national party committee to pay for unlimited television advertising on behalf of Republican candidates without treating those costs as a contribution, even though these advertisements are both coordinated with candidates and are focused almost entirely on advocating for the candidate's election ("JFC-advertising").

6.      As discussed in greater detail below, *see infra* § II.B, these ads are materially indistinguishable from ordinary candidate advertisements seen on television during election season. Each follows the same basic playbook: nearly the entire ad attacks a Democratic candidate or promotes a Republican candidate and then, in the last few seconds of the ad, the Republican candidate says "donate now" while a QR code briefly flashes across the screen and links to a donation page for a joint fundraising committee established between the NRSC and the Republican candidate. In the Republican party committees' view, because the candidate says "donate now" at the tail end of the advertisement while the donation link appears, the entire 30-second ad spot is transformed from a candidate ad into a fundraising solicitation for the joint fundraising committee.

7.      By treating these ads as a "solicitation" under the FEC's joint fundraising regulations, a Republican party committee is subsidizing candidate advertisements. It is paying for the ads according to the joint fundraising committee's allocation formula, in which the party committee often bears the largest share of the costs. In effect, such an arrangement means that national party committees could spend tens of millions of dollars on television ads on behalf of candidates and in coordination with those candidates, well in excess of the FECA limits.

8.      The Republican committees' view of the FEC's joint fundraising regulations effectively trumps the plain meaning of FECA's definition of "coordinated expenditure" and limits set by federal law, improperly rendering the statutory provisions a dead letter and wrongly

elevating agency rules over federal law. *See, e.g., Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales,* 468 F.3d 826, 829 (D.C. Cir. 2006) ("[A] valid statute always prevails over a conflicting regulation."); *Atl. City Elec. Co. v. FERC,* 295 F.3d 1, 11 (D.C. Cir. 2002) (explaining that no agency action, including a regulation, can "trump the plain meaning of a statute"); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261–62 (2024).

9.     The FEC's refusal to issue an advisory opinion on this matter was arbitrary and capricious and contrary to law. It has also denied Plaintiff—as well as similarly-situated committees and candidates—a statutory "safe harbor" under 52 U.S.C. § 30108(c) for it to engage in JFC-advertising without fear of civil and criminal penalties, leaving it at a competitive disadvantage in the days before a major federal election. One of two things is true: Republicans are violating FECA, or JFC-advertising in excess of FECA limits is permissible. Either way, the FEC should have issued an advisory opinion clarifying FECA's application to JFC-advertising so that parties like DCCC can both orient its conduct accordingly and compete on fair terms with its rivals.

10.     The FEC's failure to issue an advisory opinion regarding the legality of JFC-advertising gravely injures DCCC by requiring it to, in effect, compete on uneven terms or potentially transgress the law at the risk of enforcement actions and prosecution. DCCC is entitled to declaratory relief to resolve this ongoing harm. *See, e.g.*, *Hisp. Leadership Fund, Inc. v. FEC*, 897 F. Supp. 2d 407, 424–25 (E.D. Va. 2012) (holding that, where FEC deadlocked on advisory opinion request, plaintiff had standing to seek declaratory judgment); *Ready for Ron v. FEC*, No. CV 22-3282 (RDM), 2023 WL 3539633, at *3 & n.3 (D.D.C. May 17, 2023) (explaining that the FEC's "non-issuance of an [advisory] opinion create[s] a justiciable controversy").

11.     This Court must now do what the FEC failed to: declare that JFC-advertising schemes violate FECA and find that the FEC's refusal to render an advisory opinion to that effect violated the APA. And it should do so expeditiously by consolidating a preliminary injunction hearing with a trial on the merits within the next ten days, such that it may provide effective relief before the November 5th general election.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 as a challenge arising under the Administrative Procedure Act, 5 U.S.C. §§ 702-06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant resides within this district and because a substantial part of the events giving rise to the claim occurred in this district. Venue is further proper in this district under 28 U.S.C. § 1391(e) for the same reasons.

## PARTIES

14.     Plaintiff DCCC is the national congressional campaign committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect Democratic candidates to the U.S. House of Representatives. DCCC works to accomplish its mission by, among other things, assisting Democratic congressional campaigns throughout the country. In every election cycle, DCCC makes contributions and expenditures in the tens of millions of dollars, including on television advertisements, to persuade and mobilize voters to support Democratic congressional candidates while complying with FECA. DCCC is raising and spending similar amounts of money in the lead up to the 2024 general election, including through joint fundraising committees it has formed and will form with Democratic congressional candidates.

15. Defendant Federal Election Commission (the "FEC" or "Commission") is the federal agency charged with the administration of FECA. 52 U.S.C. § 30106(b). The FEC is required to receive written requests concerning whether certain proposed actions and transactions are legal under FECA and must respond to those requests with an advisory opinion. 52 U.S.C. § 30108(a)(1); 11 C.F.R. § 112.4(a). The FEC also has the authority to investigate suspected campaign finance violations. If the investigation reveals probable cause to believe that a civil violation occurred, the FEC may file a civil enforcement suit. 52 U.S.C. § 30109(a)(6)(A). If the FEC's investigation shows probable cause that the campaign finance violation was "knowing and willful," the FEC may also refer the case to the Attorney General for criminal prosecution. 52 U.S.C. § 30109(a)(5)(C).

## STATEMENT OF FACTS AND LAW

### I. FECA's Regulation of Expenditures Coordinated With Candidates

16. FECA imposes various contribution limits and disclosure requirements on candidates, donors, and political committees, *see generally* 52 U.S.C. § 30101 *et seq.*, and the FEC has, over time, promulgated regulations "to implement" these provisions of law, 11 C.F.R. § 100.1; *see also* 52 U.S.C. § 30107(a)(8) (granting FEC rulemaking authority).

17. As relevant here, FECA: (1) defines what constitutes a "contribution" to a candidate and prescribes limits on those contributions; (2) makes clear that a coordinated expenditure—such as a television advertisement—on behalf of a candidate constitutes a "contribution" and counts towards the relevant FECA contribution limit; and (3) establishes a process by which the FEC must grant advisory opinions to committees and candidates that can provide safe harbor protections from enforcement under FECA rules. The agency has also issued rules governing "joint

fundraising committees" established between candidates and party committees. This section addresses each of these issues.

### A.    Definition of "Contribution" and the Relevant Contribution Limits

18.    Under FECA, a "contribution" is a "gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i).

19.    FECA creates specific contribution limits that restrict how much money individuals and committees may give to candidates for federal office. In the 2024 election cycle, for example, DCCC may contribute up to $5,000 per election to a candidate, with primary and general elections treated as separate elections. *See* 52 U.S.C. § 30116(a).

20.    In addition, FECA provides that the national committee of a political party is afforded a separate limit for coordinated party expenditures for each U.S. House race. *Id.* § 30116(d). Although DCCC is not afforded a coordinated party spending limit in each U.S. House race by operation of law, the Democratic National Committee may permissibly assign some of its authority in a given state to DCCC. 11 C.F.R. §109.33(a). As relevant here, the coordinated party expenditure limit is $61,800 for congressional nominees in states that have more than one U.S. Representative. *See* FEC, *Coordinated Party Expenditure Limits Adjusted for 2024* (Jan. 29, 2024), perma.cc/H9PA-UDYY. For congressional nominees in states that have only one U.S. Representative, the coordinated party expenditure limit is $123,600. *Id.*

21.    Candidates for federal office and their committees are prohibited from knowingly accepting or making any contributions that exceed the federal limits. *See* 52 U.S.C. § 30116(f).

### B.    Coordinated Party Expenditures Are Subject to FECA Limits

22.    Under FECA, an "expenditure" is, with certain specified exceptions, "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9). FECA in turn provides that any expenditure "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, *shall be considered to be a contribution to such candidate*." 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added). Such expenditures are "coordinated expenditures."

23.    In other words, when a person coordinates with a candidate to create and air a television ad that expressly advocates for the candidate, such coordinated effort is a "contribution" to the candidate. *Id.* The Supreme Court has been clear on this point: "Expenditures coordinated with a candidate . . . are contributions under the Act." *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 438 (2001).

24.    There is an "obvious" purpose behind mandating that such "coordinated expenditures" count towards FECA limits. *Shays v. FEC*, 414 F.3d 76, 97 (D.C. Cir. 2005). "Without a coordination rule, politicians could evade contribution limits and other restrictions" on donations to candidates by simply coordinating their expenditures with the candidate. *Id.*

25.    FECA's definition of "coordination" is thus designed to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) (per curiam). It recognizes that "expenditures made after a wink or nod," or even with more explicit coordination, "often will be as useful to the candidate as cash." *McConnell v. FEC*, 540 U.S. 93, 221 (2003) (cleaned up). And "expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution and . . . pose similar dangers of abuse."

*Buckley*, 424 U.S. at 46. Any other rule would obliviate contribution limits. *See Shays*, 414 F.3d at 97 (explaining that without a coordination rule, third parties could "finance campaign activity directly – say, paying for a TV ad or printing and distributing posters").

26.     The FEC has promulgated a specific regulation for determining when a communication paid for by a national party committee is made "in cooperation, consultation or concert" with a candidate and thus becomes a "coordinated communication" under FECA. *See* 11 C.F.R. § 109.20.

27.     To be a "coordinated communication" under FEC's rule, a communication must meet a three-part test. In relevant part, the test is met if (1) the communication is "paid for by a political party committee or its agent"; (2) the communication is a "public communication" that "expressly advocates the election or defeat of a clearly identified candidate" or "refers to a clearly identified House . . . candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general election;" and (3) a candidate or their agent is "materially involved" in decisions regarding the "content" of the communication, the "means or mode" or "specific media outlet used" for the communication, or the "timing or frequency" of the communication. *Id.* §§ 109.37(a), 109.21(d).

28.     A coordinated communication paid for by a national party committee must be treated as a contribution or a coordinated party expenditure, subject to the applicable contribution limits described above. *Id.* § 109.37(b).

**C.     Joint Fundraising Regulations Promulgated by the FEC**

29.     FECA and FEC's regulations allow political committees, including a national party committee and a candidate committee, to jointly raise contributions for multiple entities, subject

9

to a set of procedures that "govern all joint fundraising activity." 52 U.S.C. § 30102(e)(3)(A)(ii); 11 C.F.R. § 102.17(a)(1)(i), (2). Such committees are known as "joint fundraising committees."

30. To form a joint fundraising committee, the participating committees must establish a separate political committee to serve as a joint fundraising representative and enter into a written agreement that "state[s] a formula for the allocation of fundraising proceeds." 11 C.F.R. § 102.17(c)(1).

31. A joint fundraising committee has a limited purpose—to "collect contributions, pay fundraising costs from gross proceeds and from funds advanced by participants, and disburse net proceeds to each participant." *Id.* § 102.17(b)(1).

32. To avoid having expenditures made by a joint fundraising committee qualify as a contribution to any of its participants, each participant in a joint fundraising committee must cover expenses proportional to their percentage of allocated receipts associated with a particular fundraising effort. *Id.* § 102.17(c)(7). And a participant "may only pay expenses on behalf of another participant subject to the contribution limits." *Id.* § 102.17(c)(7)(i)(B). For example, a party committee and a candidate who agree to create a joint fundraising committee may agree to split the committee's fundraising proceeds 90/10. In that scenario, the party committee would receive 90% of the proceeds from joint fundraising and it would pay for 90% of the expenses associated with joint fundraising, and the candidate would receive 10% of the proceeds and pay for 10% of the relevant expenses.

33. A joint fundraising "notice" must be included with "every solicitation for contributions." *Id.* § 102.17(c)(2). This notice must identify the participating committees, provide the allocation formula, and inform contributors that they may choose to designate their contributions for a particular committee. *Id.*

**D.     FEC's Obligation to Clarify the Application of FECA Through Advisory Opinions**

34.     Recognizing that "participants in the political process" must be "allow[ed] . . . to operate with substantial certainty regarding their legal obligations," FECA "permits people to request advisory opinions from the FEC regarding whether a 'specific [proposed] transaction or activity by the person' is legally permissible" under the law or FEC's regulations. *Ready for Ron*, 2023 WL 3539633, at *3 (third alteration in original) (quoting 52 U.S.C. § 30108(a)); *Hisp. Leadership Fund*, 897 F. Supp. 2d at 418 (similar).

35.     FECA requires the FEC to accept comments regarding such requests for an advisory opinion and to "render a written advisory opinion relating to such transaction or activity" within 60 days of receiving the request. 52 U.S.C. § 30108(a)(1), (d).

36.     During the "60-day period before any election" for federal office, however, the FEC "shall render a written advisory opinion relating to [any] request" submitted by a candidate or authorized committee "no later than 20 days" after receipt of the request. *Id.* § 30108(a)(2).

37.     A vote of at least four members of the FEC is required to issue a formal advisory opinion. *Id.* § 30106(c).

38.     When the FEC issues an advisory opinion, the party who requested the opinion as well as any person involved in an identical transaction or activity to that described in the request may rely in good faith on the opinion and will be protected from any sanction under FECA that might otherwise attach to the transaction or activity. 52 U.S.C. § 30108(c). This includes safe harbor from criminal prosecution by the DOJ as well as civil enforcement by the FEC. *See id.*

39.     Under FEC regulations, when four commissioners are unable to agree on an advisory opinion, the FEC will issue a response simply stating that it was "unable to approve an

advisory opinion by the required affirmative vote of 4 members" and close the request. 11 C.F.R. § 112.4(a).

40.     "Only a favorable advisory opinion provides [a] safe harbor." *Ready for Ron*, 2023 WL 3539633, at *3 (citing *Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010)). In other words, "[b]oth the issuance of an opinion disapproving the proposed action and the failure to issue an opinion because of disagreement amongst commissioners deprive the requester of any protection against subsequent enforcement." *Id.*; *see also Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir. 1995) (explaining that, following a failure to issue an advisory opinion, "nothing . . . prevents the Commission from" instituting an enforcement action "at any time," including after, "perhaps, another change of mind of one of the Commissioners").

## II.     Republicans' Ongoing Violation of Coordinated Expenditure Rules

### A.     Republicans have constructed an attempted end run around the coordinated party spending limits.

41.     Under the FECA provisions described above, a party committee may coordinate with a candidate committee to develop television advertisements that promote the candidate's campaign for office, and then pay to place those advertisements on television. But, because such efforts are clearly a "coordinated expenditure" between the party and candidate, *see Colo. Republican Fed. Campaign Comm.*, 533 U.S. at 438, they should be subject to the relevant FECA contribution limits and party coordinated expenditure limits. In other words, Plaintiff's understanding of FECA is that the law does not permit a candidate to outsource a multi-million-dollar television advertising budget to a national party committee. No rule issued by the FEC may change FECA's plain statutory text on this score. *See* 52 U.S.C. § 30116(a)(7)(B)(i); *Nat'l Family Planning & Reprod. Health Ass'n*, 468 F.3d at 829; *Atl. City Elec. Co.*, 295 F.3d at 11; *see also Loper*, 144 S. Ct. at 2261–62.

42.     At least one Republican Party committee, the NRSC ("Republican Committee") is flouting this rule, however, through what they believe to be a FECA loophole. The Republican Committee is using joint fundraising committees to coordinate with Republican candidates across the country to create and place television advertisements that appear to be typical candidate advertisements that are focused almost entirely on advocating for Republican candidates for office. *See* Ally Mutnick et al., *Senate Republicans to save millions of dollars on ads—thanks to the FEC*, Politico (Oct. 10, 2024), https://www.politico.com/news/2024/10/10/fec-joint-fundraising-committee-ads-00183356. In the view of government watchdogs and commentators, these kinds of coordinated expenditures—so-called "JFC-advertising"—should be prohibited under FECA because the Republican Committee is effectively spending "millions of dollars" on such advertisements—far beyond the relevant contribution limits. *Id.*

43.     The Republican Committee has rationalized these massive, coordinated expenditures by claiming that they are not in fact candidate advertisements, but rather fundraising pitches geared at raising money for joint fundraising committees established between the Republican Committee and its candidates. *See id.*; *see also* NRSC Comment on Advisory Opinion Request 2024-13 (Sept. 30, 2024), Ex. B at 14 (characterizing ads as creating "a JFC that engages in joint fundraising through television advertisements"). Other Republican Committees seem to support this characterization. The NRCC, for example, claims these candidate advertisements are nothing more than "routine [joint fundraising committee] solicitations." NRCC Comment on Advisory Opinion Request 2024-13 (Oct. 1, 2024), Ex. B at 39. Their defenses of this tactic rely exclusively upon the FEC's rulemaking about joint fundraising committees.

44.     Each Republican ad follows a simple formula. Nearly the entire ad attacks a Democratic candidate and promotes a Republican candidate—just like any other candidate

advertisement might. Then, in the waning seconds of the ad, the Republican candidate says "donate now" while a QR code briefly appears and links to a donation page for a joint fundraising committee established between the Republican Committee and the candidate.

45.     In the view of the Republican Committees, this brief appeal for a donation transforms an otherwise ordinary candidate advertisement—the cost of which would indisputably constitute a "coordinated expenditure" subject to FECA contribution limits—into a fundraising appeal for the joint fundraising committee, which does not constitute a "contribution" under FEC regulations provided the party committee and candidate each pays their share of the costs subject to the committee's pre-arranged fundraising formula. *See* 11 C.F.R. § 102.17(c)(7).

46.     To illustrate the point, and returning to the example above (*supra* ¶ 32), imagine Candidate Jones and her relevant party committee create a joint fundraising committee—the "Jones Victory Fund"—and agree that the funds raised by the committee will be split 90% and 10% between the party and candidate, respectively. In the view of the Republicans, the Jones Victory Fund may place *unlimited* television advertisements on behalf of Candidate Jones provided that: (1) the cost is split 90/10 between the party committee and candidate, in keeping with the joint committee's allocation formula; and (2) any such advertisement contains a brief fundraising solicitation tacked on at the end. According to the Republican party committees who commented on the DSCC's advisory opinion request, such an advertisement is not a candidate advertisement at all—it is a fundraising appeal.

47.     These JFC advertising schemes violate FECA: they allow party committees to subsidize a candidate's advertisements, which is precisely what FECA's coordination laws and contribution limits are designed to prevent. *See Colo. Republican Fed. Campaign Comm.*, 533 U.S. at 438 ("Expenditures coordinated with a candidate … are contributions under the Act.").

14

To treat the Republican Committees' payment of their candidates' television advertising as anything other than a "contribution" would appear to "create[] a loophole that effectively vitiates the plain language" of FECA. *Campaign Legal Ctr. v. Fed. Election Comm'n*, 466 F. Supp. 3d 141, 158 (D.D.C. 2020).

> **B.    Republicans are exploiting this self-created loophole to spend tens of millions of dollars beyond the relevant contribution limits.**

48.    Reviewing the Republican advertisements shows that their brief solicitations on behalf of joint fundraising committees do nothing to transform what are obviously ordinary candidate ads in every material respect into a fundraising request for the committee sponsoring the ad. They simply remain candidate advertisements.

49.    Republicans began "testing the idea" for their joint-fundraising-committee television campaign advertisements in Montana in July 2024. The first Montana ad "is narrated entirely by [the Republican Senate candidate Tim] Sheehy. He begins by discussing his military service and ends the ad by saying the phrase 'join my team, give now.'" Mutnick, et al., *supra ¶* 42. The first 26 seconds of the advertisement look exactly like any other political ad a person would expect to see in an election year. But in the final four seconds a "QR code that leads to a fundraising page briefly appears[.]" *Id.*; *see also Call to Duty*, Sheehy Victory Committee, https://host2.adimpact.com/admo/#/viewer/7c415fe7-0615-4bbe-8bfd-87beb0a47ebd.    The    ad makes <u>no mention</u> of the NRSC. But viewers with the cat-like reflexes needed to hastily grab their phones and open the QR code are taken to a donation page for the "Sheehy Victory Fund." *Secure Win Red, Sheehy Victory Committee*, https://secure.winred.com/sheehy-victory-committee/donate-today?qr=true. Further research would be required for a viewer to discern that Sheehy Victory Fund is a joint fundraising committee established by the NRSC and Sheehy.

50.     A similar ad on behalf of Sheehy follows the same formula. The ad spends 26 seconds showing an actor hired to portray Senator Tester—Montana's incumbent Democratic Senator—in a derogatory manner. *See Two Faced Tester*, AdImpact, host2.adimpact.com /admo/viewer/1dbec44e-ba10-4146-bef9-a2ef8b817084.



*Id.* at 0:02.

51.     Only in the final few seconds of the ad does candidate Sheehy appear above a QR code on screen to say "I'm Tim Sheehy, and I approve this message. Join my team. Give Today."



*Id.* at 0:27.

52.     The QR Code in the advertisement links to the same donation page for the Sheehy

Victory Committee.

53.     Both ads appear as ordinary candidate ads: one touting Sheehy and another

criticizing Senator Tester. But neither is paid for by Sheehy. Instead, the Sheehy Victory

Committee—a joint fundraising committee created by the National Republican Senatorial

Committee—has spent $2.8 million to air these ads on behalf of Sheehy in Montana. *See* Mutnick,

et   al.,   *supra*   ¶   42;   *Sheehy   Victory   Cmte   Summary*,   Open   Secrets,

https://www.opensecrets.org/jfc/summary.php?id=C00845792&cycle=2024.

54.     According to the Republican Committees, these expenditures are not subject to

FECA limits because Candidate Sheehy closes the ad by stating "Give Today" while a QR code

donation link briefly appears.

55.     Recently, Republicans began expanding this advertising tactic beyond Montana. In

mid-September, the NRSC began "running similar fundraising campaign ads in Maryland and

Arizona, with joint fundraising committees spending nearly $3 million so far on TV in the former and $500,000 in the latter." Mutnick, et al., *supra* ¶ 42. These advertisements follow the same playbook as the Montana ads. *See Law of the Land*, Hogan Victory Fund, host2.adimpact .com/admo/viewer/e530892d-80ad-422e-92e5-4c1f033f98c1; *Chose Wrong*, Kari Lake Victory Committee, host2.adimpact.com/admo/viewer/0e9a24b0-20ca-4335-8237-b4b0f27f4d8b; *More Debt for Us*, Kari Lake Victory Committee, https://host2.adimpact.com/admo/viewer/3021cbbc-3543-47ea-9bf6-2da865b36e59; *Wrong on the Border*, Kari Lake Victory Committee, host2.adimpact.com/admo/viewer/48179a76-828e-4ffe-84c9-bb6b9592a34f.

56.     Republicans have also begun running these joint fundraising committee ads in Wisconsin, Michigan, and Nebraska. *See, e.g.*, *Conflict of Interest*, WI Victory JFC/Hovde, host2.adimpact.com/admo/viewer/11285890-8d49-4fda-b7d3-ee14f8b2fddc; *More Work To Do*, Michigan Victory Committee/Rogers, host2.adimpact.com/admo/viewer/5e808a7f-a743-47c1-a6fe-de9b5169b4c2; *Radical Too*, Fischer Victory Fund, host2.adimpact.com/admo/viewer/263839c3-6342-494e-8994-70813391f0ef. Each follows the same approach above—an ordinary political advertisement, funded by a joint fundraising committee, with a cursory request to donate at the tail end of the advertisement.

57.     Republicans are expanding their unlawful strategy. "The National Republican Senatorial Committee and its candidates already set up these fundraising vehicles in several states—and they added Wisconsin, Pennsylvania and Nevada in recent weeks. Those committees have already been collecting money for a flood of the new, cheaper 'fundraising' ads." *See* Mutnick, et al., *supra* ¶ 42.

58.     By claiming that putting a QR code at the end of a political advertisement transforms that ad into mere "fundraising expenses" of various joint fundraising committees,

18

NRSC is able to shovel tens of millions of dollars into television advertisements directly on behalf of, and directly coordinated with, Republican candidates. Simply watching these ads dispels any notion that they are anything other than advocacy on behalf of the candidates.

### III.   The FEC Has Failed to Enforce the Coordinated Expenditure Law or, Alternatively, to Grant Safe Harbor for Such Conduct

59.   The Republican Committee's deployment of JFC-advertising poses a dilemma to rival Democratic candidates. On the one hand, such expenditures appear to violate FECA's contribution limits and the party coordinated expenditure limits. On the other hand, however, Democratic candidates stand at a serious competitive disadvantage if they refrain from using a tactic that permits their rivals to blow past FECA's limits and receive millions of dollars in support for television ads.

60.   FECA provides recourse for these kinds of predicaments: Interested parties are entitled to seek an advisory opinion ("AO") from the FEC seeking clarity on the legality of proposed transactions or arrangements and, in turn, the parties and third parties who engage in similar conduct are entitled to rely on any such advisory opinion issued by FEC during election season to avoid criminal prosecution by the DOJ or civil sanction by FEC. *See* 52 U.S.C. § 30108(c)(2).

61.   On September 18, 2024, after the dramatic increase in the NRSC's use of joint fundraising committees to fund television advertisements violating FECA limits, DSCC—the national party committee established for the purpose of supporting Democratic candidates for U.S. Senate, *see* 52 U.S.C. § 30101(14)—submitted a request for an official AO from FEC under 52 U.S.C. § 30108.

62.   The request, attached as Exhibit A, sought an AO regarding whether DSCC could establish joint fundraising committees for a similar purpose. More specifically, DSCC requested

an AO regarding whether it could lawfully establish a joint fundraising committee between DSCC and Montanans for Tester, and another between DSCC and Gallego for Arizona, to finance television advertisements that would primarily advocate for the relevant candidate's election.

63. DSCC specified that the two proposed joint fundraising committees would be established pursuant to the procedures in 11 C.F.R. § 102.17, and further proposed a specific allocation formula for the proposed committees: "the first two thirds of fundraising proceeds will be allocated to the DSCC while the last third will be allocated to the participating campaign . . . subject to contribution limits and contributors' ability to designate their contribution for a particular participant." Ex. A at 2.

64. DSCC further explained that the proposed advertisements would be funded by the joint fundraising committees but would almost entirely advocate for a single candidate, containing only a short fundraising solicitation for the fundraising committee itself at the very end of the advertisement accompanied by a short QR code that would link to a webpage with the disclaimers required by 11 C.F.R. § 102.17(c)(2).

65. Under the proposed arrangement, any contributions received through the fundraising solicitations in the advertisements would be divided according to the allocation formula for the joint fundraising committee, as would expenses for the advertisement. Thus, in effect, only a fraction of the cost of the advertisements would be paid by the relevant candidate's committee. As a result, costs associated with the proposed advertising would far exceed DSCC's contribution limit and coordinated party spending limit under FECA with respect to each candidate.

66.     In all other respects, as DSCC's AO request explained, the advertisements would be "indistinguishable to the viewer from a standard campaign advertisement" run by candidates. Ex. A at 5.

67.     Based on this proposal, DSCC requested an AO from FEC as to (1) whether the proposed joint fundraising committees could lawfully "finance the entire costs of the proposed television advertising, allocating the costs according to the Allocation Formula," and in the alternative, (2) whether the proposed joint fundraising committees could fund "the portion of the television advertising that includes a solicitation for the Joint Fundraising Committee, calculated on a time/space basis" (i.e., divided based on the time dedicated to the particular candidate vs. the few seconds allocated for the fundraising solicitation). Ex. A at 3.

68.     DSCC requested that an expedited advisory opinion be issued as soon as possible but no later than the maximum 20 days prescribed by the statute. Ex. A at 1; *see* 52 U.S.C. § 30108(a)(2) ("If an advisory opinion is requested by . . . any authorized committee . . . during the 60-day period before any election for Federal office . . . the Commission shall render a written advisory opinion relating to such request no later than 20 days after the Commission receives a complete written request.").

69.     Such expedited consideration would either provide DSCC and similarly-situated committees "safe harbor" to mirror the JFC-advertising tactic employed by Republicans or, alternatively, confirm that such a tactic is not lawful. *See* 52 U.S.C. § 30108(c). In other words, regardless of the outcome, the AO would at least level the playing field between Democratic and Republican candidates.

70.     The FEC accepted the AO request for review pursuant to 52 U.S.C. § 30108 and FEC regulations, *see* 11 C.F.R. § 112.1, assigned the request AO No. 2024-13, and posted the request on FEC's website for public comment on September 18, 2024. *See* Ex. B at 143.

71.     On September 23, the FEC requested a three-day extension of the 20-day deadline (from October 8 to October 11) so that it could set consideration of the request for an open meeting scheduled for October 10. DSCC agreed to the extension. *See* Ex. B at 1.

72.     On October 3, ahead of the FEC's October 10 meeting on DSCC's request, the General Counsel for the FEC released two draft advisory opinions and invited public opinion on both drafts. *See* Ex. B. at 44–69.

73.     The first draft ("Draft A") concluded that the proposed joint fundraising committees could "pay the entire cost of the proposed television advertising, allocating the costs according to the allocation formula in the joint fundraising agreement, because the advertising would be joint fundraising activity containing a solicitation." Ex. B. at 58. In other words, Draft A approved of the JFC-advertising tactic being employed by the Republicans.

74.     The second draft ("Draft B") concluded that the proposed joint fundraising committees could "pay for *only the portion of the proposed advertisements that solicit contributions for the joint fundraising committee*, with the cost of that portion allocated among the committee's participants according to their agreed allocation formula." Ex. B at 85 (emphasis added.). In other words, Draft B disapproved of the JFC-advertising tactic, making clear that only the few seconds of actual solicitation counted as a fundraising expense.

75.     Several groups submitted comments regarding DSCC's request and the FEC's subsequent draft advisory opinions. The full set of comments is attached as Exhibit B.

76.     On the merits, DSCC's request explained that DSCC and its candidates worried that allowing the joint fundraising committee to "finance the full cost of the advertising runs contrary to" FECA and the FEC's "joint fundraising regulations, which prohibit joint fundraising in a manner that allows one participant to subsidize the costs of another participant." Ex. A at 6.

77.     Multiple nonpartisan groups agreed that joint fundraising committees are not permitted to finance television advertisements in such a manner and would be subject to enforcement action if they did so. *See* Ex. B. at 78–87, 98–105. Instead, these groups argued that the proposed television advertisements could only be allowed on a time/space allocation basis and also must include the entire disclaimer required by 11 C.F.R. § 102.17(c)(2).

78.     Eight Republican groups argued that the arrangements are not unlawful under 11 C.F.R. § 102.17 and 52 U.S.C. § 30116. The NRCC (DCCC's Republican counterpart) filed a comment stating that the DSCC's proposal was lawful and that in the scenario proposed by the AO, the joint fundraising committee "must finance the entire cost of any joint fundraising solicitation—including the proposed television advertising." Ex. B at 37.

79.     On October 10, 2024, the FEC held a contentious hearing on DSCC's Request. The FEC did not approve either draft advisory opinion and instead deadlocked 3-3 (along partisan lines) in votes on each draft advisory opinion. *See* AOR 2024-13 Certification, Ex. B. at 140.

80.     The three Republican members of the FEC voted in favor of Draft A, which would have approved of the JFC-advertising tactic being employed by the Republicans. In voting against Draft A, Commissioner Lindenbaum emphasized that "slapping a solicitation on an ad doesn't make it a solicitation" and the FEC "has said that as a group a number of different times." FEC, Open    Meeting,    October    10,    2024,    at    44:58-45:10,    available    at https://youtu.be/UG0Gj4TnFAY?t=2688.

81.     In a letter to the DSCC following the hearing, the FEC confirmed that it had closed the matter. *See* Ex. C at 1 ("The purpose of this letter is to inform you that the Commission has concluded its consideration of your advisory opinion request without issuing an advisory opinion."). The FEC's case file for DSCC's AOR makes clear that this is its "Final Opinion" on the issue. *See* FEC, AO 2024-13  https://www.fec.gov/data/legal/advisory-opinions/2024-13/ (deeming October 10 closeout letter the agency's "Final Opinion").

82.     The FEC's failure to reach a decision has injured Plaintiff. Had the FEC confirmed that the JFA-advertising tactics used by Republicans are unlawful, it would have redressed Plaintiff's competitive injury by restoring a level playing field. Alternatively, if the FEC decided the practice was lawful, Plaintiff and other similarly situated committees could have relied on the opinion under the "safe harbor" provision of FECA to fund television advertisements in a similar fashion without risk of criminal or civil punishment. *See* 52 U.S.C. § 30108(c). Without such safe harbor protection, Plaintiff is chilled from engaging in such conduct due to the prospect of enforcement proceedings and onerous sanctions. *See generally* 52 U.S.C. § 30109.

83.     Because the FEC failed to issue an opinion at all, Plaintiff is unable to "operate with substantial certainty regarding their legal obligations." *E.g.*, *Ready for Ron*, 2023 WL 3539633, at *3; *cf. Hisp. Leadership Fund*, 897 F. Supp. 2d at 425 (deadlocked FEC opinion left plaintiff at risk of enforcement).

84.     In other words, if JFC-advertising is permissible, the FEC's nondecision unlawfully deprives Plaintiff of safe harbor protections while ensuring it remains at a competitive disadvantage to its Republican opponents.

85.     The FEC's failure to render an AO has left DCCC in an untenable position. It may either suffer severe competitive harm by sitting on its hands while Republican committees and

candidates reach voters through tens of millions of dollars in JFC-advertising, or it may engage in the same tactic that plainly runs contrary to the text of 52 U.S.C. 30116(a)(7)(B)(i) but without any safe harbor protections and at risk of future enforcement proceedings from the FEC—or worse, criminal prosecution by the DOJ.

86.    Moreover, the DCCC is suffering an informational injury. The Republican advertisements are being paid for by joint fundraising committees that allocate their costs based on the total amount of funds raised. But because the DCCC is in the dark as to how much each advertisement raises, it does not know how much each committee is paying for each advertisement. If the Republican advertisements were being reported as is required under FECA, they would be disclosed as contributions or coordinated party expenditures, which are required to be disclosed on the party committee's reports. *See* 52 U.S.C. § 30104. DCCC, naturally, wishes to support its own preferred candidates to the same extent and in the same manner as the Republicans. And, but for the failure of the FEC to render an advisory opinion granting safe harbor protection, DCCC would spend money to provide JFC-advertising on behalf of its candidates beyond the limitations imposed by FECA. But because of the legally doubtful nature of such spending, DCCC is hesitant to spend funds in a manner that may violate campaign finance laws. The FEC's failure to render an AO on this issue—one way or the other—has chilled DCCC from supporting its candidates. And if Plaintiff is in fact wrong in believing that JFC-advertising is subject to FECA limits, it both deserves to know that and to receive the benefits of safe harbor protection from the FEC. That is the entire purpose of the AO process.

87.    As Republicans plow ahead unchecked by a "paralyzed" FEC that refuses to issue an AO on this issue, DCCC's opportunity to connect with voters and support its candidates remains hindered by the legal uncertainty surrounding JFC-advertising, placing them at a greater

disadvantage. *See* Mutnick, et al., *supra* ¶ 42. Absent expedient relief, DCCC will remain at a competitive disadvantage during the most critical weeks of election season. And, absent permanent relief, Plaintiff will remain at a competitive disadvantage in elections moving forward.

88.     This Court should issue a preliminary injunction that sets the FEC's "Final Opinion" opinion declining to issue an advisory opinion aside because that final decision is contrary to law, in violation of the APA.

## CLAIM FOR RELIEF

**Administrative Procedure Act (5 U.S.C. § 706; 28 U.S.C.A. § 2201(a))**

89.     Under FECA, the FEC "shall render a written advisory opinion" when sought by a requesting party. 52 U.S.C. § 30108(a)(1). It also "shall administer, seek to obtain compliance with, and formulate policy with respect to" FECA. *Id.* § 30106(b)(1).

90.     The FEC failed to issue such an AO requested by the DSCC and several Democratic candidate committees. It instead issued a closeout letter indicating it had closed the request for an AO without rendering any opinion. *See* Ex. C. It deemed this letter its "Final Opinion."

91.     DCCC, as a political party committee akin to DSCC, stood to benefit equally from any such advisory opinion because it stands in the same position as DSCC when it comes to JFC-advertising. *See* 52 U.S.C. § 30108(c); *Hisp. Leadership Fund*, 897 F. Supp. 2d at 424.

92.     By failing to issue an advisory opinion, the FEC acquiesced to the Republicans' efforts to continue making coordinated expenditures to support JFC-advertising that grossly exceed FECA's limitations on how much a national party committee can contribute to a candidate. *See* 52 U.S.C. §§ 30101(8)(A)(i), 30116(a), (d). This ongoing tolerance of illegal campaign spending harms DCCC and its affiliated candidates, which must compete against such unlawful

tactics. And it further deprives Plaintiff and similarly situated organizations of the safe harbor protections offered by FECA. *See* 52 U.S.C. § 30108(c).

93.     The FEC's failure to issue an advisory opinion was "not in accordance with law" and "contrary to constitutional right[s]" in several respects. 5 U.S.C. § 706(2). *First*, it has failed to administer and uphold FECA's contribution and party coordinated expenditure limits, *see, e.g.*, 52 U.S.C. § 30116(a)(7)(B)(i), by failing to issue an AO making clear that expenditures to pay for a candidate's television advertisements are "contributions" under FECA that are subject to the statute's limits. *Second*, it has deprived Plaintiff and similarly situated organizations of safe harbor protection for such excess expenditures to support JFC-advertising, chilling Plaintiff from engaging in what would otherwise be protected speech (if consistent with FECA), while nonetheless tolerating and acquiescing to similar behavior from Plaintiff's competitors.

94.     These failures have irreparably harmed Plaintiff. *First*, it has forced DCCC and its affiliated candidates to operate at a structural disadvantage, as Republican Committees pour money into candidate ads without penalty. *Second*, it has chilled Plaintiff from engaging in JFC-advertising by refusing to clarify Plaintiff's legal obligations or to offer safe harbor protection from criminal and civil sanctions for such expenditures.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Issue preliminary and permanent injunctive relief that sets aside the FEC's October 10, 2024 Closeout Letter as agency action that is contrary to law (5 U.S.C. § 706);

B. Declare that expenditures made by a national party committee in cooperation, consultation, or concert with a candidate for television advertisements with joint fundraising solicitations are "contributions" under 52 U.S.C. § 30116(a)(7)(B)(i) and thus subject to FECA's limits (5 U.S.C. § 706; 28 U.S.C. §§ 2201-02);

C. Award Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

D.  Grant such other and further relief as the Court deems just and proper.

Dated: October 17, 2024

Respectfully submitted,

*/s/ Aria C. Branch*
**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Christopher D. Dodge (DC 90011587)
Renata O'Donnell (DC 1723929)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
cdodge@elias.law
rodonnell@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

*Attorneys for Plaintiff*