## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DCCC,<br><br>          *Plaintiff*,<br><br>     v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>          *Defendant*,<br><br>NRSC,<br><br>          *Intervenor-Defendant*. | Civil Action No. 24-cv-2935 (RDM) |

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Democratic Congressional Campaign Committee ("DCCC") is a national campaign committee for the Democratic Party dedicated to electing Democratic candidates to the U.S. House of Representatives. Dkt. 1 at 5 (Compl. ¶ 14). As part of its mission, the DCCC makes contributions and expenditures to support Democratic congressional candidates. Those contributions and expenditures are subject to the Federal Election Campaign Act of 1971 ("FECA"), 52 U.S.C. § 30101 *et seq. Id.* The DCCC alleges that, in the run-up to the 2024 election, one of its competitors, the National Republican Senatorial Committee ("NRSC"), has been circumventing FECA's contribution and coordinated party expenditure limits by running sham joint fundraising ads, which have very little to do with fundraising and very much to do with election advocacy. According to the DCCC, the NRSC has used this strategy to spend "tens of millions of dollars on television advertisements to expressly advocate for the election of Republican candidates in full coordination with those candidates," Dkt. 1 at 1 (Compl. ¶ 1),

"well beyond the limits for contributions and coordinated party expenditures set forth in" FECA, Dkt. 6 at 9.

Administrative proceedings leading up to this case began in September 2024, when the Democratic Senatorial Campaign Committee ("DSCC"), which supports Democratic candidates for the U.S. Senate, sought an advisory opinion from the Federal Election Commission ("FEC" or "Commission"), asking whether funds spent on advertisements like those funded by the NRSC and candidates that it supports should be counted as contributions for the purposes of FECA. Dkt. 6-1 at 2.  "In order to allow participants in the political process to operate with substantial certainty regarding their legal obligations, [FECA] permits people to request advisory opinions from the FEC regarding whether a 'specific [proposed] transaction or activity by the person' is legally permissible."  *Ready for Ron v. FEC*, No. 22-3282 (RDM), 2023 WL 3539633, at *3 (D.D.C. May 17, 2023) (quoting 52 U.S.C. § 30108(a)(1)).  If the FEC approves of a practice in an advisory opinion, the party that requested the opinion, "and any person involved in an identical transaction or activity to that described in the request, may rely in good faith on the opinion and will be protected from any sanction under FECA that might otherwise attach to the transaction or activity."  *McCutcheon v. FEC*, 496 F. Supp. 3d 318, 324–25 (D.D.C. 2020) (citing 52 U.S.C. § 30108(c)).  FECA further provides, however, that no advisory opinion shall be issued absent "the affirmative vote of [four] members of the Commission."  52 U.S.C. § 30106(c); *see also id.* § 3010(a)(7).  And because the Commission is composed of six members, "[n]o more than" three of whom "may be affiliated with the same political party," *id*. § 30106(a)(1), tie votes are both common and indecisive.  That is what happened here.  The FEC split three-three in its consideration of the DSCC's request for an advisory opinion, leaving that committee—and others—without the benefit of the safe harbor.

At that point, the DSCC dropped the matter.  Its sister campaign committee, the DCCC,

however, picked up where the DSCC left off.  On October 17, 2024, the DCCC brought the

pending suit, alleging that that the NRSC and other campaign committees "are exploiting this

self-created loophole" to engage in coordinated spending in excess of the limits set in FECA.

Dkt. 1 at 15.  By doing so, the DCCC alleges, the NRSC has unfairly tipped the playing field in

its favor, and by failing to issue an advisory opinion either rejecting or approving this loophole,

the FEC "has left the DCCC between a rock and a hard place during the most critical weeks of

campaigning," Dkt. 6 at 9.  It can either "mimic the Republicans' newfound tactic, but at the risk

of exposing itself to future enforcement by the FEC," or it can comply with the dictates of the

FECA, at the cost of accepting an uneven playing field.  *Id.*  According to the DCCC's

complaint, "[t]he FEC's failure to issue an advisory opinion was 'not in accordance with law'

and [was] 'contrary to constitutional right[s]' in several respects," in violation of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  Dkt. 1 at 27 (Compl. ¶ 93).  The

complaint seeks injunctive relief setting aside the FEC's October 10, 2024 "closeout letter" and a

declaration "that expenditures made by a national party committee in cooperation, consultation,

or concert with a candidate for television advertisements with joint fundraising solicitations are

'contributions'" within the meaning of FECA and are "thus subject to FECA's limits."  Dkt. 1 at

27.

Shortly after filing suit, the DCCC filed a motion for a preliminary injunction requesting

that the Court consolidate the preliminary injunction with an expedited trial on the merits,

pursuant to Rule 65(a)(2), or, in the alternative, issue "a preliminary injunction that vacates and

sets aside the FEC's October 10 final order as arbitrary and capricious and contrary to FECA."

Dkt. 6 at 1–2, 38.  The next day, the Court issued an order setting a scheduling conference for October 21, 2024, and requiring the DCCC to ensure that the FEC received actual notice of that order.  Min. Order (Oct. 18, 2024).  Then, at the scheduling conference, the Court set a briefing schedule and a hearing date.  Min. Entry (Oct. 21, 2024).  The NRSC subsequently moved to intervene, and the Court granted that motion.  Dkt. 14; Min. Order (Oct. 23, 2024).  Finally, the Court heard argument from the DCCC, the FEC, and the NRSC on October 28, 2024.

For the reasons explained below, the Court will **DENY** the DCCC's request to consolidate its motion for a preliminary injunction with trial on the merits and will **DENY** the DCCC's motion for a preliminary injunction.

## I. BACKGROUND

### A.    Statutory and Regulatory Background

The Federal Election Campaign Act sets forth a comprehensive scheme regulating federal campaign finance.  *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 14 (1998); *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 784 (D.C. Cir. 2022).  It imposes disclosure and reporting requirements on candidates for public office and their campaign committees, 52 U.S.C. § 30104(b)(3)(A), and limits on the amounts that individuals and organizations may contribute to a candidate for federal office, *id.* § 30121(a)(1)(A).

FECA defines a "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office."  *Id.* at § 30101(8)(A)(i).  The Act, then, sets specific contribution limits, including limits on individual contributions to candidates and their authorized committees and, as relevant here, limits on contributions from political committees (other than a state committee of a political party) of $5,000 per candidate per election.  *Id.* at § 30116(a)(1)(C) &

(a)(6).  Moreover, "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committee, or their agents," are treated as "a contribution to [that] candidate."  *Id.* § 30116(a)(7)(B)(i).  An "expenditure," in turn, is defined to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  *Id.* § 30101(9)(A)(i).

FECA generally prohibits the designation of a "political committee which supports . . . more than one candidate" as an "authorized committee," *id.* § 30102(e)(3)(A)—that is, as "the principal campaign committee or any other political committee authorized by a candidate . . . to receive contributions or [to] make expenditures on behalf of [that] candidate," *id.* § 30101(a)(6).  But, as an exception to this general rule, FECA permits candidates to "designate a political committee established *solely* for the purpose of joint fundraising by such candidate as an authorized committee."  *Id.* § 30102(e)(3)(A)(ii) (emphasis added).  As the FEC explains in its opposition brief:

> The participants in a joint fundraising effort must enter into a written agreement that "shall state a formula for the allocation of fundraising proceeds."  11 C.F.R. § 102.17(c)(1)–(2).  Each participant's share of joint fundraising expenses must be calculated based on the percentage of receipts the participant has been allocated under the joint fundraising agreement.  *Id.* § 102.17(c)(7)(i)(A).  The payment by one participant of another participant's expenses is treated as a contribution subject to contribution limits.  *Id.* § 102.17(c)(7)(i)(B).  . . .
>
> 11 C.F.R. § 102.17(c) also requires a joint fundraising notice to be included in every solicitation for contributions by a joint fundraising committee.  *See id.* The notice must include the names of all committees participating in the joint fundraising activity, the allocation formula, a statement informing contributors that they can designate their contributions for a particular participant, and a statement informing contributors that the allocation formula may change if the contribution exceeds the allowable limit.  *Id.* at § 102.17(c)(2)(i)(A)–(D).

Dkt. 17 at 12–13.

The present dispute turns on the interaction between FECA's contribution and coordinated party expenditure limits and the ability of national party committees, like the NRSC and the DCCC, to form joint fundraising committees with specific candidates for federal office and to use those joint committees to spend large sums of money (in excess of the contributions and coordinated party expenditure limits) to purchase television advertisements that mirror campaign ads, but include (very) brief solicitations for contributions. Concerned that this practice might violate FECA, the DSCC requested that the FEC issue an advisory opinion— either approving or disapproving the process—so that the national campaign committees could operate on equal and clear footing.

FECA allows participants in the political process to request advisory opinions from the six-member FEC regarding whether a "specific [proposed] transaction or activity" is legally permissible. 52 U.S.C. § 30108(a)(1). The FEC is required to accept comments on the request and to issue a response within 60 days, although that 60-day window is shortened to 20 days "during the 60-day period before any election for Federal office involving the requesting party." *Id*. § 30108(a)(2), (d). FECA specifies, however, that no advisory opinion shall issue absent "the affirmative vote of [four] members of the Commission." *Id*. § 30106(c). If four commissioners are unable to agree on the content of an advisory opinion, the FEC "issue[s] a written response stating that the Commission was unable to approve an advisory opinion by the required affirmative vote of [four] members." 11 C.F.R. § 112.4(a). But if at least four commissioners agree to approve the proposed course of action and issue a favorable advisory opinion, the party who requested the opinion "and any person involved in an identical transaction or activity to that described in the request, may rely in good faith on the opinion and will be protected from any sanction under FECA that might otherwise attach to the transaction or activity." *McCutcheon*,

496 F. Supp. 3d. 318 at 324–25 (citing 52 U.S.C. § 30108(c)).  Only a favorable advisory

opinion offers this safe harbor.  Both the issuance of an opinion disapproving the proposed action

and the FEC's inability to reach a majority decision on the request deprive the requester (and

others) of any protection against subsequent enforcement.  *See Unity08 v. FEC*, 596 F.3d 861,

865 (D.C. Cir. 2010); *Chamber of Com. of the U.S. v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir.

1995).

**B.    Factual and Procedural Background**

The advertisements at issue in this case look a lot like ordinary campaign ads.  The ads

identified for the Court, for example, present specific Republican Senatorial candidates in a

positive light and their Democratic opponents in a negative light.  Some of the ads are narrated

by Republican candidates, who tout their middle-class backgrounds or military experience.  *See*

*More Work to Do*, Michigan Victory Fund/Rogers, https://perma.cc/GY65-XBX6; *Call to Duty*,

Sheehy Victory Committee, https://perma.cc/9S62-6XMR.  Others accuse their Democratic

opponents of corruption or radicalism.  *See Conflict of Interest*, WI Victory JFC/Hovde,

https://perma.cc/8KUC-ZX7Z; *Radical Too*, Fischer Victory Fund, https://perma.cc/AV7G-

FBPX.  All of the ads, however, end with a short fundraising pitch—some version of "Join my

team.  Give today."—and an on-screen QR-code.

According to the NRSC, those last few seconds set these ads apart from other campaign

ads.  *See* Dkt. 16 at 38.  The QR-code links to a page where people can donate to a joint

fundraising committee set up by the candidate's campaign committee and the NRSC.  According

to the NRSC, that means that these ads qualify as joint fundraising activities and that they can be

paid for jointly by the participants in the joint fundraising committees—here, the NRSC and the

candidates' campaign committees—according to an agreed-upon allocation formula.  *Id.* at 37–

38.  In the NRSC's view, its share of those payments does not constitute a campaign contribution or coordinated party expenditure, so long as any *proceeds* from the fundraising activities are split between the NRSC and the candidate's committees according to that same formula.  *See* 11 C.F.R. § 102.17(c)(6), (7).  On the NRSC's theory, however, it makes no difference whether the joint fundraising committee spends millions of dollars to promote the candidate and collects only a handful of small contributions (or, indeed, any contributions), so long as the ad ends with a fundraising tagline and QR-code.

As the use of these so-called joint fundraising ads became more common, the DSCC turned to the FEC for "guidance regarding whether, and under what conditions," FECA and FEC "regulations permit [the] use [of] joint fundraising committee[s] to run television advertisements that primarily advocate for the election of either [a senator or congressman] but also contain a brief fundraising solicitation at the end of the advertisements."  Dkt. 6-1 at 2.  The DSCC's request indicated that the committee "wishe[d] to establish two separate joint fundraising committees—one between the DSCC and Montanans for Tester and one between the DSCC and Gallego for Arizona"—and described ads that roughly paralleled those that the NRSC was already running with candidates, by using joint fundraising committees.  *Id*. at 3.  The request further explained that the ads "will primarily advocate for Senator Tester's re-election . . . or Congressman Gallego's election," but that "each advertisement will contain a fundraising solicitation for the relevant Joint Fundraising Committee."  *Id.*  The request continued:

> Specifically, each advertisement will include a QR code during the final few seconds that, when scanned, links to an online fundraising page for the applicable Joint Fundraising Committee.  The advertisement will also include a brief oral solicitation.  Any contributions received through the fundraising page associated with the QR code will be divided according to the Allocation Formula.  Expenses for the advertisement will also be divided between participants on the basis of the Allocation Formula.  Each Joint Fundraising Committee would like to disseminate the advertisements beginning this month

> and continuing through the 2024 general election. The advertisements
> supporting Senator Tester will run in Montana, while the advertisements
> supporting Congressman Gallego will run in Arizona. The candidates and/or
> their agents will be materially involved in decisions regarding their
> advertisements' content, timing and mode of distribution. The cost of the
> advertising would exceed the DSCC's contribution limit or coordinated party
> spending limit with respect to each candidate.

*Id.* The request than provided "[a] sample script," which advocated for Senator Tester's re-election and ended with the tagline "Join my team and donate now" and a QR code with a link "to a fundraising page for the Joint Fundraising Committee." *Id.* at 3–4. Overall, the DSCC proposed to air a thirty-second ad in which twenty-six seconds were "devoted to messaging supporting" a Democratic candidate and where "[o]nly the final four seconds" included a solicitation for the joint fundraising committee. *Id.* at 5.

Against this backdrop, the DSCC posed three questions to the FEC:

1. May each Joint Fundraising Committee finance the entire costs of the proposed television advertising, allocating the costs according to the Allocation Formula?

2. In the alternative, may each Joint Fundraising Committee finance the portion of the television advertising that includes a solicitation for the Joint Fundraising Committee, calculated on a time/space basis (approximately four seconds in the example provided), allocating the costs according to the Allocation Formula?

3. If the answer to question 1 or 2 is yes, does the Act require that the television advertising contain an on-screen disclaimer that meets the requirements of 11 C.F.R. § 102.17(c)(2)?

*Id.* at 4. In light of the rapidly approaching November 5 election, the DSCC requested that the FEC expedite its request. *Id.* at 2.

Following the required procedure, the FEC accepted the advisory opinion request for review and posted it on the FEC's website for public comment. *See* Dkt. 6-2 at 143. The FEC then released two draft advisory opinions and invited public comment. Dkt. 6 at 24. The first,

"Draft A," would have approved of the use of joint fundraising committee to fund the proposed ads in their entirety and would not have required an on-screen disclaimer. *Id.* at 24–25. The second, "Draft B," would have imposed the stricter funding requirement, "making clear that only the few seconds of actual solicitation counted as a fundraising expense" and that only that portion could be funded without counting as a contribution or coordinated expenditure. *Id* at 25; *see also* Dkt. 6-2 at 58. The FEC received comments on these proposals and held an open meeting to discuss the issue. Dkt. 6-3 at 2. Ultimately, however, the Commission deadlocked, with three commissioners voting in favor of Draft A and three voting in favor of Draft B. *Id.* The FEC issued a written response to the request for an advisory opinion on October 10, 2024, notifying the DSCC that the Commission "was unable to render an opinion in this matter." *Id.*

At that point, the DSCC dropped the matter, and the DCCC stepped in to continue the fight. The DCCC's motion for preliminary injunction and request to consolidate trial on merits with that motion are now before the Court.

## II. DISCUSSION

### A. Request to Consolidate

The Court begins with the DCCC's request that the Court consolidate its motion for a preliminary injunction with a trial on the merits. Dkt. 6 at 1–2. As the DCCC observes, Federal Rule of Civil Procedure 65(a)(2) permits a court to "advance the trial on the merits and [to] consolidate" the motion for preliminary relief with a trial on the merits. Fed. R. Civ. P. 65(a)(2). Although consolidation can, at times, serve important goals, including "eliminating unnecessary delay" and "obviat[ing] the need to decide whether a preliminary injunction is necessary," courts must proceed with caution when deciding whether consolidation is warranted; the court's discretion to consolidate "must be tempered by the due-process principle that fair notice and an

opportunity to be heard must be given the litigants before the disposition of a case on the merits."

11A Wright, Miller & Kane, Federal Practice and Procedure § 2950, at 255, 257 (2013 ed).

Here, neither the FEC nor the NRSC has joined in the DCCC's request, and the parties (and the

Court) have been required to move with unusual dispatch, given the upcoming election.  Under

these circumstances—and because the parties' arguments focus almost exclusively on the

DCCC's request for limited, emergency relief—the Court concludes that consolidation is

unwarranted.

**B.      Request for a Preliminary Injunction**

The Court, accordingly, turns to the DCCC's request for a preliminary injunction.  "A

preliminary injunction is an extraordinary remedy that should be granted only when the party

seeking the relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391

F.3d 251, 258 (D.C. Cir. 2004).  To prevail, a party seeking a preliminary injunction must show

(1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in

the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4)

"that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008).

Although the question whether FECA and the governing regulations permit a national

campaign committee and candidate to use a joint fundraising committee to run campaign ads,

without regard to contribution and coordinated party expenditure limits, poses a number of

important issues, the Court is unpersuaded that the pending motion presents an appropriate

vehicle to reach those questions.  At this stage of the litigation, the DCCC seeks only one form of

preliminary relief: it asks the Court—at least temporarily—to set aside the FEC's response

notifying the DSCC that the Commission was unable to approve an advisory opinion by the

required affirmative vote of four members.  As an initial matter, the Court notes that it is far from

clear what it would mean to set aside a notice indicating that the FEC had split three-three in

considering the advisory opinion request and was thus unable to issue the requested advisory

opinion.  And it is equally unclear what it would mean to set aside that *non-decision* only

*temporarily*, pending resolution of the case on the merits.  The one thing that seems clear,

however, is that granting that relief would neither redress the DCCC's asserted injuries nor avoid

any irreparable injury that the DCCC would otherwise suffer.

      The limited preliminary relief that the DCCC seeks poses twin hurdles for the committee:

First, to obtain a preliminary injunction, the DCCC bears the burden of demonstrating that it is

likely to succeed on the merits, including by demonstrating that it has standing to seek the

particular relief at issue.  *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987)

(Williams, J., concurring and dissenting) (noting that a party seeking preliminary injunctive

relief must demonstrate a likelihood of success, which "necessarily includes a likelihood of the

court's *reaching* the merits, which in turn depends on a likelihood that the plaintiff has

standing") (emphasis in original).  Second, a showing that the movant is likely to suffer some

irreparable injury in the absence of emergency relief is the *sine qua non* for obtaining a

preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the

parties have had the opportunity fully to develop the evidence and fully to present their

respective cases.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.

Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to

issue a preliminary injunction, even if the other three factors entering the calculus merit such

relief."); *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 241–42 (D.D.C. 2014);

*Trudeau v. FTC*, 384 F. Supp. 2d 281, 296–97 (D.D.C. 2005).  Thus, whether framed in terms of

standing or irreparable injury, it is well settled that the Court may not issue a preliminary

injunction absent a showing that the requested, emergency relief is needed to prevent—and will

likely prevent—the movant from suffering an imminent injury.

Before turning to the three types of injury that the DCCC invokes in support of its

motion, the Court pauses to note that any skepticism that the Court may have regarding the

DCCC's standing to seek a preliminary injunction temporarily setting aside the Commission's

written response—or, more accurately, non-response—to the DSCC's advisory opinion request,

is limited in two respects.  First, the Court's analysis is limited to the narrow form of relief

sought in the pending motion—that is, an order setting aside the FEC's non-response response.

To the extent the DCCC also seeks declaratory relief in its complaint, the Court expresses no

view on the committee's standing to pursue that distinct form of relief.  Second, as both the

plaintiff and the movant, the DCCC bears the burden of demonstrating that it has standing—or,

at least, likely has standing—and the arguments that the committee has made to date have

focused solely on whether it will suffer a cognizable injury if the Commission's October 10 letter

is not set aside.  Finally, the Court notes that its skepticism with respect to standing to seek

preliminary relief does not extend to the DCCC's arguments on the merits—that is, its argument

that FECA cannot plausibly be read to permit national party committees and the candidates that

they support to evade the statutory contribution and coordinated expenditure limits by merely

adding a brief tagline and QR-code to the end of a campaign ad.

Turning back to standing and irreparable injury, the DCCC premises its motion for

preliminary relief on three alleged injuries, which it says that it is currently suffering and will

continue to suffer absent preliminary relief.  *First*, it claims that it is currently suffering and will

continue to suffer "a competitive injury" because the FEC has "permitted Republicans to pour

tens of millions of dollars into competitive elections" through a "potential violation[] of campaign finance law" that "DCCC and its candidates cannot in good faith engage in given the legal uncertainty around such practice." Dkt. 6 at 32, 35. *Second*, it claims that it has been left "in legal limbo," which has "chilled" its "ability to communicate its messages to voters" because the "DCCC must self-censor" in order to avoid risking "sanctions and potential criminal penalties." *Id.* at 33, 36. *Third*, it claims that it is "suffering an informational injury" because it is "being deprived of information that would assist it in evaluating the campaign strategy of rival candidates and parties"—namely, "how much each committee is paying for each advertisement." *Id.* at 33–34, 37.

The Court is unpersuaded that the relief that the DCCC requests in its motion—setting aside the FEC's non-response response—would prevent or redress any of these asserted injuries. In its motion, the DCCC asks only that the Court vacate and set aside the FEC's October 10 letter stating that it had completed its review of the DSCC's request without issuing an advisory opinion. Dkt. 6 at 11, 38. The DCCC does not ask the Court to enjoin the FEC from taking enforcement action against it, nor does it ask that the Court enjoin the NRSC from engaging in the challenged conduct. It asks only that the Court vacate the FEC's letter. *Id.*

That letter, however, merely reported that the FEC had spit three-three on the advisory opinion request and, thus, was unable to offer the requested advice. Dkt. 1-3 at 2 ("The purpose of this letter is to inform you that the Commission has concluded its consideration of your advisory opinion request without issuing an advisory opinion."). Explaining that "[t]he Commission voted [three-to-three] on" both of the "draft advisory opinions" and that "[t]he affirmative vote of four members of the Commission is required to render an advisory opinion under the Federal Election Campaign Act," the letter concluded that "the Commission was

unable to render an opinion in this matter." *Id.* It did not take a position on the lawfulness—or unlawfulness—of the conduct at issue. Nor did it provide any party with any legal rights, defenses, or obligations.

Understood in this light, it is far from clear that vacating the October 10 letter would have any legal effect at all, let alone any effect that might prevent or redress the DCCC's asserted injuries. An order temporarily vacating the letter would neither give the DCCC a safe harbor nor prevent the NRSC (and others) from continuing to air the allegedly sham joint fundraising ads. As a result, at least in its present posture, this case is on different footing from cases in which setting aside FEC action would have prevented or redressed the plaintiffs' injuries.

In *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005), for example, the D.C. Circuit held that congressional candidates had standing to challenge an FEC regulation that the candidates argued was contrary to law and that permitted their opponents to engage in campaign financing practices prohibited by the Bipartisan Campaign Finance Reform Act ("BCRA"). *Id.* at 201. Those regulations, however, unlike the FEC's October 10 letter, affirmatively authorized conduct that would otherwise have been illegal; the plaintiffs' "asserted injury—having to defend their office in illegally constituted reelection fights—. . . stem[med] from the operation of regulations permitting what BCRA bans." *Id.* (internal quotation marks and citation omitted). That close causal connection—and the concrete benefit that a judgment on the merits would afford the plaintiffs—was sufficient to satisfy the redressability requirement. *Id.* at 204; *see also Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 657 (D.C. Cir. 2005) ("'Where an agency rule causes the injury,' as here, 'the redressability requirement may be satisfied by vacating the challenged rule.'" (quoting *America's Community Bankers v. FDIC*, 200 F.3d 822, 828–89 (D.C. Cir. 2000)) (alteration omitted). Here, in contrast, the FEC's October 10 letter did not

affirmatively authorize any conduct and did not establish a safe harbor permitting the DCCC's opponents to violate FECA.

This case is closer to, but still on different footing from, *Hispanic Leadership Fund, Inc. v. FEC*, 897 F. Supp. 2d 407 (E.D. Va. 2012), which (like this case) concerned a challenge to the FEC's failure to issue an advisory opinion due to deadlock. *Id.* at 414–15. In that case, the plaintiff wanted to run eight advertisements but was concerned that doing so would trigger FECA's disclosure requirements. *Id.* There (as here), the plaintiff sought to rely on an advisory opinion request submitted by a different organization, and there (as here), the FEC deadlocked in relevant respects and was thus unable to issue an advisory opinion. *Id.* at 415. Finally, there (as here), the plaintiff alleged that it was prepared to run the ads if the FEC approved the practice in an advisory opinion, thus providing the providing the plaintiff was a safe harbor. *Id.* But that is where the similarities with this case end. Most notably, the plaintiff in *Hispanic Leadership Fund* brought a pre-enforcement First Amendment challenge, seeking a declaratory judgment that its proposed ads were not electioneering communications under the statute and, if they were, that the statute was unconstitutional as applied to those ads. *Id.* at 419. It also sought a preliminary injunction barring the FEC "from enforcing the FECA disclosure provisions with regard to these advertisements." *Id.* Whether meritorious or not, those requests for relief had immediate, real-world consequences for the *Hispanic Leadership Fund*—namely, that it would, if granted relief, have been able to run its proposed ads without fear of facing an enforcement action. *See also Unity8 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (holding that a plaintiff who had been denied a safe harbor, to which it was entitled, had standing to challenge that denial).

Here, in contrast, the DCCC has not asked—at least at this stage—for a declaratory judgment authorizing it to run joint fundraising ads without complying with FECA's contribution

and consolidated expenditure limits.  Rather, the pending motion merely seeks to set aside the FEC's October 10 letter, which itself has no operative legal effect.  Recognizing the difficulties it faces in showing that a decision setting aside that letter would prevent or would redress an ongoing or imminent injury, the DCCC suggested at oral argument that the Court could "grant the type of relief that [the Court] think[s] is appropriate," Dkt. 20 at 17 (Oct. 28, 2024 Hrg. Tr. 17:11–13).   But that is not how the process works.  The Court's role is limited to deciding whether the relief that the DCCC sought in its motion—that is, vacatur of the October 10 letter— would likely prevent and redress an ongoing or imminent irreparable injury.  In an effort to establish that link, the DCCC asserts, with little explanation, that "various injuries will be redressed by a preliminary injunction that vacates and sets aside the FEC's October 10 final order as contrary to FECA."  Dkt. 6 at 35.  It says that such a vacatur will "provide clarity to Plaintiff and likely discourage others from exploiting the legal vacuum the FEC has created."  *Id.* Its efforts to back up these contentions, however, fall flat.

Start with the competitive injury and the alleged chill on the DCCC's ability to campaign. On the DCCC's telling, the FEC's October 10 letter—although lacking legal effect—had a pragmatic effect: "the fact that the FEC deadlocked" on the DSCC's advisory opinion request "sort of gave" the NRSC "the green light" to continue funding the advertisements as joint fundraising activities.  Dkt. 20 at 58 (Oct. 28, 2024 Hrg. Tr. 58:21–23).  Knowing that the FEC was split three-three on the issue, for example, might have led the NRSC to conclude that it is unlikely that the Commission will authorize an enforcement action anytime soon.  But as *Hispanic Leadership Fund* notes, the fact that the FEC had deadlocked on the issuance of an advisory opinion "does not foreclose the Department of Justice from bringing a criminal prosecution, nor does it foreclose a private party from filing a complaint with the FEC," and,

even if the Commission were to decline to proceed in response to that complaint, its "decision not to investigate [would be] subject to review by a district court." 897 F. Supp. 2d at 425. Moreover, that type of (possible) practical consequence is too speculative and too remote to support a claim of standing or irreparable injury.

The DCCC also argues that the NRSC had admitted that it will "cease its unlawful behavior" if this Court vacates the October 10 letter. Dkt. 19 at 18. For support, it asserts that the NRSC "admits" in its motion to intervene that "an adverse judgment" would "prevent the NRSC from using any joint fundraising committee arrangements" like the ones in the advisory opinion request. *Id.* (quoting Dkt. 14 at 5). But at the hearing on the motion for preliminary injunction, the NRSC clarified that it was referring to an adverse judgment in the case as a whole, not an adverse decision on the motion for a preliminary injunction. Dkt. 20 at 39 (Oct. 28, 2024 Hrg. Tr. at 39:12–25). Nowhere in the NRSC's motion to intervene or in its briefs does it say that it would cease its advertising upon a mere vacatur of the FEC's October 10 letter. That distinction, moreover, makes sense. The DCCC's complaint seeks a declaratory judgment, holding "expenditures made by a national party committee in cooperation, consultation, or concert with a candidate for television advertisements with joint fundraising solicitations are 'contributions' under [FECA] and [are] thus subject to FECA's limits." Dkt. 1 at 27. A judgment of that type would likely "prevent the NRSC from using any joint fundraising committee" to evade FECA's contribution and coordinated expenditure limits. Dkt. 19 at 18. A preliminary injunction setting aside the FEC's October 10 letter, however, would not.

Finally, the DCCC maintains that "the FEC is likely to adhere to this Court's ruling, including in any future rulemaking and in the advisory opinions process." Dkt. 19 at 19. That observation, and the suggestion that the NRSC and others would likely take note were the Court

to issue a decision granting the DCCC's motion for a preliminary injunction, however, once again misunderstands the connection between the relief requested and the alleged injury that is necessary to satisfy the standing and irreparable injury requirements. The Court is unaware of any precedent—and the DCCC points to none—holding that it is sufficient to show that a court's reasoning might—standing alone, and independent of any relief the Court might order—affect future decisions from an administrative agency or the behavior of those the agency regulates. Such a holding would vastly expand the contours of standing and irreparable injury and would open the doors to litigants with only indirect and speculative interests in pending cases. It would also render the Declaratory Judgment Act a nullity, since every judicial opinion would serve the purposes of a declaratory judgment. The DCCC does not seek declaratory relief in its pending motion, nor has it taken advantage of the process for obtaining expedited declaratory relief, *see* Fed. R. Civ. P. 57. The Court expresses no view on whether such a motion would have merit but does conclude that the hope (or even the prospect) that the Court's reasoning might have persuasive force is no substitute for seeking a form of judicial relief—that is, a judicial order— that will prevent and redress an alleged injury.

In addition to the DCCC's asserted competitive and chilling injuries, the DCCC also alleges that it has suffered and will continue to suffer an informational injury absent preliminary relief. That is because the NRSC and others are spending some amounts on so-called joint fundraising ads and not disclosing those amounts as campaign contributions in the required expenditure disclosures. But, again, vacating the FEC's October 10 letter would not remedy that problem. The letter takes no position on whether the funds at issue constitute contributions that are subject to the disclosure requirements. For the reasons discussed above, vacating the letter would thus have no legal bearing on the DCCC's alleged informational injury. Nothing in the

19

Court's order would require the FEC to bring an enforcement action, on the one hand, or to approve the practice in an advisory opinion, on the other hand, and the Court's opinion—resolving a motion for a preliminary injunction—would have no binding precedential effect.

Finally, the Court notes that, as things currently stand, the DCCC, the DSCC, the NRSC, and the DCCC's direct counterpart, the NRCC, are all on an even playing field. Each of these committees works with skilled campaign finance counsel and is well-equipped to make its best judgment about the risk of a future enforcement action or prosecution. Nothing in the FEC's October 10 letter tilted this playing field, and an order from this Court vacating the October 10 letter would not shift the ground in any legally relevant manner. In short, the campaign committees are in precisely the same position today that they were in before the Commission issued its October 10 letter, and they would remain in that same position even if the Court were to issue a preliminary injunction setting the letter aside.

Under these circumstances, the Court cannot conclude that the DCCC is likely to prevail on the merits with respect to the relief sought (because it has yet to demonstrate that the order that it seeks would redress a cognizable injury) or that a preliminary injunction is necessary to prevent the DCCC from suffering an irreparable injury. Because the DCCC has failed to carry its burden with respect to the two most important prongs of the standard for issuing a preliminary injunction, and because, in any event, the remaining prongs cannot be satisfied for these same reasons, the Court must deny the DCCC's motion.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction, Dkt. 6, is

hereby **DENIED**.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  November 1, 2024