**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DCCC,<br>*Plaintiff*,<br>v.<br>FEDERAL ELECTION COMMISSION,<br>*Defendant*,<br>NRSC,<br>*Intervenor-Defendant.* | Civil Action No. 24-cv-2935 (RDM) |

**MEMORANDUM OPINION**

Plaintiff Democratic Congressional Campaign Committee ("DCCC") is a national campaign committee with the mission of electing Democratic Party candidates to the U.S. House of Representatives. Dkt. 28 at 6 (Am. Compl. ¶ 15). To further its mission, the DCCC makes contributions and expenditures in support of Democratic congressional candidates. *Id.* The Federal Election Campaign Act of 1971 ("FECA" or "the Act"), 52 U.S.C. § 3010 *et seq.*, imposes disclosure obligations and limits on both contributions to political candidates and political parties' expenditures for campaign activities that are made in coordination with candidates. When a political party's committee makes expenditures for campaign activities in coordination with a candidate, those expenditures are referred to as coordinated party expenditures, and, until recently, they were subject to contribution limits.

The DCCC's Amended Complaint alleges that, in the lead-up to the 2024 election, "the National Republican Senatorial Committee ('NRSC') began relying on an implausible reading of an agency regulation in order to circumvent statutory limits that Congress has placed on

coordinated spending between political parties and their candidates," and the DCCC's competitor, "[t]he National Republican Congressional Campaign Committee ('NRCC') soon followed suit." Dkt. 28 at 1 (Am. Compl. ¶ 1). In short, the NRSC and NRCC ran a coordinated campaign, the primary focus of which was expressly advocating for the election of the candidates they supported. But, because the ads included brief taglines asking supporters to "Give Today," the NRSC and NRCC maintained that the ads were simply joint-fundraising efforts, which fall outside the then-existing coordinated-expenditure limits. *Id.* at 18 (Am. Compl. ¶ 55); *see also id.* at 2 (Am. Compl. ¶ 1). The NRSC and NRCC spent "tens of millions of dollars on" these ads "in full coordination with those candidates" and "far exceed[ed] the limits [on coordinated party expenditures] set forth in federal law." *Id.* at 1–2 (Am. Compl. ¶ 1) (emphasis omitted).

In September 2024, the Democratic Senatorial Campaign Committee ("DSCC"), which supports Democratic candidates for the U.S. Senate, sought an advisory opinion from the Federal Election Commission ("FEC") on the question whether amounts spent on joint-fundraising advertisements like the ones funded by the NRSC and NRCC were subject to FECA's coordinated expenditure limits. Pursuant to FECA, those subject to the Act may request advisory opinions from the FEC before taking action to confirm whether a "specific [proposed] transaction or activity by the person" is legally permissible. *Ready for Ron v. FEC*, No. 22-cv-3282, 2023 WL 3539633, at *3 (D.D.C. May 17, 2023) (quoting 52 U.S.C. § 30108(a)(1)). Notably, a "favorable advisory opinion" approving the proposed action provides a "safe harbor" against any enforcement action under FECA. *Id.*

Issuance of an advisory opinion requires "the affirmative vote of 4 members of the Commission." 52 U.S.C. § 30106(c). If four of the commissioners cannot agree on the

substance of an advisory opinion, the FEC will issue a letter "stating that the Commission was unable to approve an advisory opinion by the required affirmative vote of 4 members." 11 C.F.R. § 112.4(a). With respect to the DSCC's request for an advisory opinion addressing whether ads like those paid for by the NRSC were subject to FECA's limits on contributions and coordinated party expenditures, the FEC deadlocked, with three members voting in favor of one result and three in favor of the other. The FEC accordingly issued a Closeout Letter on October 10, 2024, informing the requesters that it had "concluded its consideration" of the request "without issuing an advisory opinion" because no opinion received the affirmative vote of four members. Dkt. 46 at 152–53 (AR 148–49).

The DSCC did not seek judicial review of the FEC's closeout of its advisory-opinion request. But its sister committee, the DCCC, filed this suit challenging the FEC's decision not to render an advisory opinion as arbitrary and capricious and contrary to law under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"). Dkt. 1 at 27 (Compl. ¶ 93). The DCCC alleged that the agency "failed to administer and uphold FECA's contribution and party expenditure limits . . . by failing to issue an [advisory opinion] making clear that expenditures to pay for a candidate's television advertisements are 'contributions' under FECA that are subject to the statute's limits," and further alleged that the agency deprived the DCCC "of safe harbor protection for such excess expenditures to support" similar "advertising." *Id.* Among other things, the DCCC sought a preliminary injunction and a declaration that expenditures made on the ads at issue qualify as "contributions" under the Act and are "thus subject to FECA's limits." *Id.* (Prayer for Relief). The same day that the DCCC filed suit, it moved for a preliminary injunction, Dkt. 6, and less than a week later, the NRSC intervened as a defendant, Dkt. 14

(motion for leave to intervene); Min. Order (Oct. 23, 2024) (granting intervention). On November 1, 2024, the Court denied the DCCC's motion for a preliminary injunction. Dkt. 21.

On December 20, 2024, the DCCC filed the currently operative, amended complaint. Dkt. 28. The FEC and the NRSC each moved to dismiss that complaint on various grounds, including that the DCCC lacked standing to challenge the FEC's decision not to issue an advisory opinion in response to DSCC's request and that the FEC's October 10, 2024, Closeout Letter resulting from the deadlocked three-three vote was not a "final agency action" reviewable under the APA, 5 U.S.C. § 704. Dkt. 32 (NRSC); Dkt. 34 (FEC). The DCCC opposed both motions and cross-moved for summary judgment. Dkt. 36; Dkt. 37.

Shortly after those motions were fully briefed, the Supreme Court granted the NRSC's petition for a writ of certiorari in *National Republican Senatorial Committee v. Federal Election Commission*, No. 24-621 (June 30, 2025), which raised a First Amendment challenge to FECA's political-party coordinated-expenditure limits. The NRSC argued that this Court "should not proceed to the merits" of the instant dispute "without first receiving the Supreme Court's direction on the First Amendment issues." Dkt. 49 at 2. The Court agreed and stayed the case pending the Supreme Court's decision. Min. Order (July 31, 2025).

On June 30, 2026, the Supreme Court issued its decision in *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404, 2413 (2026) (hereinafter "*NRSC*"), striking down "FECA's limits on political parties' coordinated expenditures." In light of this development, the Court requested supplemental briefing addressing whether the Supreme Court's intervening decision rendered the DCCC's claim moot and whether the DCCC has an ongoing live interest in vacatur of the FEC's October 10, 2024, Closeout Letter or a declaration that joint-fundraising

advertisements like the NRSC's qualify as "contributions" for purposes of FECA's disclosure requirements. Dkt. 57 at 62 (Tr. 62:1–6).

In its supplemental briefing, the DCCC does not dispute that the reason for the DSCC's advisory-opinion request—whether joint-fundraising advertisements like those run by NRSC are subject to FECA's limits on coordinated party expenditures—no longer presents a live controversy for judicial review, after the Supreme Court's decision in *NRSC* rendered those limits unenforceable. Instead, the DCCC has shifted course to focus on the NRSC's failure to file contribution reports disclosing its spending on these ads as coordinated party expenditures. The DCCC argues that, had the FEC answered the DSCC's advisory-opinion request in the manner that the DCCC contends FECA requires, that opinion would have established that the ads at issue qualify as coordinated expenditures and that, even if the contribution limits no longer apply, the coordinated-expenditure disclosure rules do. That matters, according to the DCCC, because the failure to report these coordinated expenditures under FECA has caused, and continues to cause, the DCCC a cognizable injury by depriving it of valuable information to which it has a statutory right. The DCCC now asks the Court to vacate the October 10, 2024, Closeout Letter and to issue a declaratory judgment answering a question that the DSCC never asked the FEC to decide in the first instance: whether advertisements like the ones at issue are subject to FECA's reporting requirements for coordinated party expenditures, rather than its provisions governing the reporting of joint-fundraising communications.

But even if there are some circumstances in which the FEC's non-issuance of an advisory opinion presents a justiciable controversy upon which the Court may grant declaratory relief, *see Ready for Ron*, 2023 WL 3539633, at *3 n.3, those circumstances are not present in this case. For present purposes, the Court need not decide whether the DCCC has established a cognizable

informational injury resulting from the NRSC's (and the NCCC's) reporting of these ads as joint-fundraising communications rather as coordinated party expenditures, because the DCCC cannot clear other jurisdictional hurdles. Most notably, the DCCC has not established that its injury, if any, is traceable to the FEC's non-issuance of a decision on a question that is now moot. Nor has the DCCC demonstrated that setting aside the FEC's Closeout Letter would redress DCCC's asserted injury, as vacatur of the letter would not require the FEC to issue any advisory opinion at all, let alone the advisory opinion that DCCC seeks. The DCCC's claim, reframed as it has been in light of the Supreme Court's intervening decision, presents a question that is unmoored from the request presented to the FEC and from the action—or nonaction—the agency actually took. In these circumstances, the claim does not present a judiciable controversy within the Court's power to adjudicate.

The Court will, accordingly, **GRANT** Defendant's and Intervenor-Defendant's motions to dismiss and **DENY** Plaintiff's motion for summary judgment.

## I. BACKGROUND

### A. Statutory and Regulatory Background

Congress enacted FECA "to remedy any actual or perceived corruption of the political process" by regulating financing of political campaigns. *FEC v. Akins*, 524 U.S. 11, 14 (1998). Among other things, FECA imposes disclosure and reporting requirements on candidates for public office and their campaign committees, 52 U.S.C. § 30104(b)(3), as well as limits on contributions to political candidates, including political committees' expenditures in coordination with those candidates, *id.* § 30116(a)(1)(A), (a)(2)(A), (d)(3).

For purposes of these limits, "contributions" are defined to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." *Id.* § 30101(8)(A)(i). Contributions to a

candidate also include "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." *Id.* § 30116(a)(7)(B)(i). Expenditures include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." *Id.* § 30101(9)(A)(i).

To avoid circumvention of these limits, candidates may not designate a "political committee" that "supports . . . more than one candidate," *id.* § 30102(e)(3)(A), as an authorized committee "to receive contributions or make expenditures on behalf of [the] candidate," *id.* § 30101(6). But notwithstanding this rule, candidates may "designate a political committee established solely for the purpose of joint fundraising by such candidates." *Id.* § 30102(e)(3)(A)(ii). When candidates designate political committees for joint-fundraising efforts, FEC regulations require that the candidate and the committee "state a formula for the allocation of fundraising proceeds" in a written agreement and that each participant pay a percentage of the fundraising expenses equal to the percentage of the proceeds allocated to them by this formula. 11 C.F.R. § 102.17(c)(1)–(2), (7)(i)(A). When one participant in a joint-fundraising effort pays another participant's expenses, that payment is treated as a contribution. *Id.* § 102.17(c)(7)(i)(B).

The FEC has also promulgated regulations governing communications paid for by national political party committees in coordination with candidates. *See* 11 C.F.R. § 109.37. A communication paid for by a political party committee or its agent in coordination with a candidate falls within these rules if, as relevant here, the communication is a "public communication" that "expressly advocates the election or defeat of a clearly identified candidate" or "refers to a clearly identified House or Senate candidate and is publicly distributed

or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general . . . election." *Id.* § 109.37(a)(2)(ii), (iii)(A). Party coordinated communications are subject to FECA's limits on contributions and coordinated party expenditures. *Id.* § 109.37(b).

To reduce uncertainty among those seeking to navigate its shoals, FECA authorizes those who want to take a proposed action but worry they may inadvertently contravene one of its substantive provisions to request an advisory opinion from the six-member FEC on whether a "specific [proposed] transaction or activity" is legally permissible. *DCCC v. FEC*, No. 24-cv-2935, 2024 WL 4650907, at *3 (D.D.C. Nov. 1, 2024) (hereinafter "*DCCC I*") (quoting 52 U.S.C. § 30108(a)(1)). The FEC must accept comments on the request and issue a response within a designated timeframe—60 days in the ordinary course, or 20 days if the request is made within 60 days of an election in which the requester is a participant. 52 U.S.C. § 30108(a)(2), (d). Issuing an advisory opinion requires "the affirmative vote of 4 members of the Commission." *Id.* § 30106(c). The FEC may not issue an advisory opinion absent four votes; rather, if four commissioners cannot agree on the answer to the question posed, the FEC must "issue a written response stating that the Commission was unable to approve an advisory opinion by the required affirmative vote of 4 members." 11 C.F.R. § 112.4(a).

For regulated parties, advisory opinions carry significant legal importance: If the FEC, with the affirmative vote of four members, issues an advisory opinion approving of the proposed course of action, the requester "and any person involved in an identical transaction or activity to that described in the request, may rely in good faith on the opinion and will be protected from any sanction under FECA that might otherwise attach to the transaction or activity." *DCCC I*, 2024 WL 4650907, at *3 (quoting *McCutcheon v. FEC*, 496 F. Supp. 3d 318, 324–25 (D.D.C.

2020)). This "safe harbor" exists only when the FEC issues a "favorable" advisory opinion. *Id.* Regulated parties have no such safe harbor when the FEC issues an advisory opinion disapproving of the proposed action or when the FEC is unable to reach a majority decision. *Id.*

The advisory opinion process is distinct from the administrative complaint process, which permits those who believe that someone has violated FECA to file a complaint with the FEC. 52 U.S.C. § 30109(a)(1). Anyone "aggrieved by an order of the Commission dismissing a complaint . . . or fail[ing] . . . to act on [a] complaint" may, during a prescribed period, "file a petition with" this Court seeking review of the FEC's dismissal or failure to act. *Id.* § 30109(a)(8)(A). To prevail on such a petition, the complainant must, among other things, establish that the FEC's "dismissal . . . or failure to act is contrary to law." *Id.* § 30109(a)(8); *see also Campaign Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 252 (D.D.C. 2021). If the court declares that the agency's dismissal of the complaint or failure to act was contrary to law, and if the FEC fails "to conform to such declaration within 30 days," the complainant may then "bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C). To date, the DCCC has not sought to invoke this process to challenge what it views as its competitors' violation of FECA's reporting requirements.

**B. Factual and Procedural Background**

The Court has previously recounted much of the factual background and procedural history in this case, *see DCCC I*, 2024 WL 4650907, and will not repeat those details here. For present purposes, the Court will focus on the facts and procedural history necessary to resolve the FEC's and NRSC's Motions to Dismiss and the DCCC's Cross-Motion for Summary Judgment.

In the leadup to the 2024 election, the NRSC began running advertisements that, in significant part, focused on positively portraying specific Republican Senatorial candidates and/or negatively portraying those candidates' Democratic opponents. But for a very short fundraising appeal at the end, the ads were classic campaign ads, which included words of express advocacy. Some advertisements, for example, would be narrated by Republican candidates themselves and would highlight features of those candidates' backgrounds, while others primarily attacked their Democratic opponents on grounds of purported corruption or radicalism. *See, e.g.*, *More Work to Do*, Michigan Victory Fund/Rogers, https://perma.cc/GY65-XBX6; *Two Faced Tester*, Ad Impact, https://perma.cc/K3MX-88JS. In the final few seconds, each ad would end with a brief fundraising request along the lines of "Join my team. Give today," accompanied by a QR code linking to the donation page.

According to the NRSC, these final few seconds transform what would otherwise be a coordinated party expenditure and contribution into a joint-fundraising advertisement not subject to FECA's limits. Under this theory, the NRSC and the candidates' campaign committees could jointly pay for the advertisements according to an agreed-upon formula without requiring the NRSC's share of the expenses to be treated as contributions to the candidate. This arrangement would be permissible as long as any fundraising proceeds were split between the NRSC and the candidates' committees according to the same formula—regardless of how much or how little those advertisements actually raised.

Based on its concerns that the NRSC's use of these purported "joint-fundraising ads" allowed the NRSC to circumvent FECA and to spend millions of dollars supporting Republican senatorial candidates without regard to the Act's contribution or coordinated-party-expenditure limits, the DSCC requested an advisory opinion from the FEC. *See* Dkt. 46 at 5–11 (AR 1–7).

In its request, the DSCC stated that it "wishe[d] to establish two separate joint fundraising committees" for each of two identified Senate candidates. *Id.* at 6 (AR 2). And the DCCC proposed to run ads that "would be materially indistinguishable" from those the NRSC was already running, with a primary focus on advocating for the specific candidate and a brief oral fundraising solicitation at the end, alongside a QR code. *Id.* at 9 (AR 5). The DSCC's request stated that the cost of these ads "would exceed the DSCC's contribution limit or coordinated party spending limit with respect to each candidate." *Id.* at 6 (AR 2).

After outlining this proposed course of action, the DSCC requested that the FEC answer three questions:

1. May each Joint Fundraising Committee *finance* the entire costs of the proposed television advertising, *allocating the costs* according to the Allocation Formula?

2. In the alternative, may each Joint Fundraising Committee *finance* the portion of the television advertising that includes a solicitation for the Joint Fundraising Committee, calculated on a time/space basis (approximately four seconds in the example provided), *allocating the costs* according to the Allocation Formula?

3. If the answer to question 1 or 2 is yes, does the Act require that the television advertising contain an on-screen disclaimer that meets the requirements of 11 C.F.R. § 102.17(c)(2)?

*Id.* at 7 (AR 3) (emphases added). The questions posed made no mention of reporting requirements and, instead, focused only on how the ads were financed.

The FEC accepted the advisory opinion request for review and prepared two draft advisory opinions, which were posted for public comment. Dkt. 28-2 at 144 (Ex. B at 143). One draft, "Draft A," proposed to approve joint-fundraising committees' funding of the full cost of the proposed ads without any on-screen disclaimer. Dkt. 46 at 55–67 (AR 51–63). The other, "Draft B," proposed to conclude that only the final few seconds of the ad in which the solicitation occurred could be funded without counting as a contribution or coordinated

expenditure. *Id.* at 68–80 (AR 64–76). After a period of public comment and an open meeting to discuss the issue, neither draft received the required four votes. Three commissioners voted in favor of Draft A, and the other three voted in favor of Draft B, leaving the FEC deadlocked. *Id.* at 151 (AR 147). On October 10, 2024, the FEC sent a letter notifying the DSCC that the Commission "was unable to render an opinion in this matter" and closing out the request. *Id.* at 152 (AR 148).

The DSCC did not pursue the matter further. But its sister campaign committee, the DCCC, filed this suit on October 17, 2024, challenging the FEC's non-issuance of an advisory opinion as arbitrary and capricious, not in accordance with law, and contrary to constitutional rights in violation of the APA, 5 U.S.C. § 706(2). Dkt. 1. The DCCC also sought a preliminary injunction and requested that the Court consolidate the injunction with an expedited trial on the merits pursuant to Rule 65(a)(2) or issue a "preliminary injunction" vacating and setting aside the FEC's October 10, 2024, Closeout Letter. *DCCC I*, 2024 WL 4650907, at *2. After the NRSC intervened, and all three parties briefed the motion and presented oral argument, the Court denied the DCCC's motion on the ground that the requested relief—temporarily setting aside the October 10, 2024, Closeout Letter—"would neither redress the DCCC's asserted injuries nor avoid any irreparable injury that the DCCC would otherwise suffer." *Id.* at *6.

Following the Court's denial of preliminary relief, the DCCC amended its complaint, *see* Dkt. 28, and both the FEC and the NRSC moved to dismiss, *see* Dkt. 32; Dkt. 34. The DCCC, in turn, cross-moved for summary judgment. *See* Dkt. 37. Shortly after these motions were fully briefed, the Supreme Court granted certiorari in *NRSC*, and the Court stayed these proceedings pending a decision in that case. On June 30, 2026, the Supreme Court issued its decision in *NRSC*. The Court overruled its decision in *FEC v. Colorado Republican Federal Campaign*

*Committee*, 533 U.S. 431 (2001) (hereinafter "*Colorado II*"), and held that FECA's limits on coordinated party expenditures violated the First Amendment and are therefore unenforceable. *NRSC*, 146 S. Ct. 2404. Following a hearing on the effect of the Supreme Court's decision in *NRSC* on the DCCC's claim, the Court directed the parties to file supplemental briefing addressing, inter alia, whether *NRSC* rendered DCCC's claims moot and whether DCCC has established an informational injury sufficient to support Article III standing. *See* Dkt. 57 at 62 (Tr. 62:1–14); Min. Order (July 29, 2026).

The Court now considers the FEC's and the NRSC's Motions to dismiss and the DCCC's Cross-Motion for Summary Judgment.

## II. LEGAL STANDARD

"Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Blackwood of DC, LLC v. IRS*, No. 23-cv-7, 2024 WL 5044606, at *2 (D.D.C. Sept. 11, 2024). The Court must dismiss any claim over which it lacks subject-matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006).

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) seeking dismissal for lack of subject-matter jurisdiction may take one of two different forms. First, a Rule 12(b)(1) motion "may raise a 'facial' challenge to the Court's jurisdiction." *Hale v. United States*, No. 13-cv-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015). A facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 346–47 (D.C. Cir. 2018). In this posture, the Court must accept the

factual allegations of the complaint as true and construe them in the light most favorable to the non-moving party. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (collecting cases).

"Alternatively, a Rule 12(b)(1) motion may pose a 'factual' challenge to the Court's jurisdiction." *Hale*, 2015 WL 7760161, at *3. When a motion to dismiss is framed in this manner, "the [C]ourt may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "The [C]ourt has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," so long as it "afford[s] the nonmoving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984) (citation modified).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), in contrast, "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see* Fed. R. Civ. P. 12(b)(6). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). The complaint need not include "detailed factual allegations," and a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555–56 (2007) (citation modified). The Court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

Finally, the Court can reach the DCCC's motion for summary judgment only if it first clears the preceding jurisdictional and pleading hurdles. Summary judgment is appropriate under Rule 56 when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012) (citation omitted). In the unique context of a case brought under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1341 (D.C. Cir. 1995). The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as agency actions taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). In an APA case,

summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (citation modified).

## III. ANALYSIS

At this juncture, the Court must determine whether the Supreme Court's intervening decision invalidating FECA's limits on coordinated party expenditures has rendered Plaintiff's claim moot and, if anything remains of that claim, whether the DCCC has established its Article III standing to pursue its requested relief.

The DCCC's Amended Complaint alleges that the FEC's Closeout Letter and corresponding failure to issue an advisory opinion violated FECA and the APA in three respects. First, the DCCC alleges that the FEC's non-issuance of an opinion was "not in accordance with law" because "the FEC did not fulfill its duty to administer and uphold FECA's plain contribution and party coordinated expenditure limits." Dkt. 28 at 30 (Am. Compl. ¶ 97). Second, it alleges that the FEC's non-issuance of an opinion was arbitrary and capricious because three Commissioners' votes "reflect[] a plainly incorrect and implausible understanding of FECA." *Id.* (Am. Compl. ¶ 97). And finally, it alleges that the FEC's non-issuance of an opinion was contrary to the DCCC's constitutional rights because the FEC "deprived [the] DCCC of safe harbor protection from enforcement actions against JFC [joint-fundraising committee] advertising in excess of FECA's limits in future elections, chilling Plaintiff from engaging in what would otherwise be protected speech (if such expenditures are consistent with FECA), while the agency nonetheless tolerates and acquiesces to similar behavior from Plaintiff's competitors." *Id.* at 31 (Am. Compl. ¶ 97). The DCCC requested that the Court "[d]eclare that JFC-advertising expenditures, as defined and described in [the DSCC's advisory

opinion request], constitute 'contributions' under 52 U.S.C. § 30116(a)(7)(B)(i) and are thus subject to FECA's limits"; "[h]old unlawful and set aside the FEC's October 10, 2024[,] Closeout Letter" under the APA; or, in the alternative, "permanently enjoin the FEC from pursuing enforcement actions or otherwise prosecuting DCCC for engaging in JFC-advertising in excess of FECA contribution limits." *Id.* at 31 (Prayer for Relief).

In its supplemental briefing, the DCCC does not dispute that the subject of the DSCC's initial request—whether party committees may "finance" advertisements like the ones described without running afoul of FECA's limits on coordinated party expenditures—was rendered moot by the Supreme Court's invalidation of the statutory limits that gave rise to the controversy. The DCCC nonetheless continues to press its APA challenge to the FEC's non-issuance of an advisory opinion on the ground that the non-decision has inflicted an informational injury on the DCCC by failing to clarify that the NRSC's (and the NCCC's) spending on joint-fundraising advertisements like the ones described is subject to FECA's reporting requirements for coordinated party expenditures. *See* Dkt. 60 (DCCC Supp. Mem.) (focusing entirely on DCCC's theory of informational injury); Dkt. 57 at 10 (Tr. 10:2–9) (stating, "I won't . . . dispute the fact that a major part of our pleadings was about not wanting to allow for circumvention of coordinated expenditure cap that are no longer enforceable" but arguing that the DCCC's "informational injury has been there" and preserves jurisdiction).

The Court agrees with the parties that the Supreme Court's intervening decision overruling *Colorado II* and invalidating FECA's coordinated-party-expenditure limits has mooted the issue that the DSCC presented to the FEC and on which the DCCC's APA claim is almost entirely focused. After the Supreme Court's invalidation of FECA's coordinated-party-expenditure limits, a judgment by this Court setting aside the FEC's Closeout Letter, declaring

that the advertisements described are subject to those limits, or enjoining the FEC from enforcing those limits against the DCCC with respect to similar advertisements would not redress any injury resulting from the DCCC's inability to compete on an equal playing field with the NRSC or any other national committee in terms of dollars spent on joint-fundraising ads of the sort described in the request. Even assuming that the advertisements in question (or all but the last few seconds of those ads) fall within FECA's provisions governing coordinated party expenditures, the DCCC's concern about the NRSC's circumvention of FECA's limits on such expenditures no longer presents a live controversy. Alleged circumvention of funding limits does not sustain a justiciable controversy once an intervening event, like the Supreme Court's decision here, has rendered those limits otherwise unenforceable. And, to the extent the DCCC wishes to fund its own advertisements like the ones described, it, too, may do so without regard to FECA's now-invalidated limits on coordinated party expenditures.

Nor does the DCCC's eleventh-hour shift to a theory of informational injury rescue its claim. Although the Court does not doubt that the DCCC *could* suffer a cognizable informational injury from the NRSC's failure to disclose information about its joint-fundraising advertisements, the DCCC has failed to establish that any informational injury related to the NRSC's alleged noncompliance with FECA's reporting requirements is traceable to the FEC's non-issuance of an advisory opinion based on its deadlock regarding a request submitted by a party not before this Court on a question about FECA's contribution limits that is no longer live. Nor has the DCCC established that a judicial decision vacating the FEC's October 10, 2024, Closeout Letter would redress any such injury. The Court accordingly lacks jurisdiction to adjudicate DCCC's claim, which, despite its presentation as an APA claim for review of what

DCCC contends is an FEC "action," is wholly untethered from both the request submitted to the agency and the action the agency took.

**A. Mootness**

The doctrine of mootness, derived from Article III's limit on the federal judicial power, "ensures that federal courts decide only 'actual, ongoing controversies.'" *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1127 (D.C. Cir. 2024) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). Mootness is a "threshold jurisdictional issue." *Gjoci v. U.S. Dep't of State*, 171 F.4th 430, 434 (D.C. Cir. 2026) (citation modified). "Among other salutary purposes," the doctrine "protects courts from rendering impermissible advisory opinions." *Pub. Citizen*, 92 F.4th at 1128 (citation modified). The mootness doctrine directs that a federal court may not decide a case when an intervening event has transpired such that the court "cannot grant any effectual relief." *Mehneh v. Rubio*, 164 F.4th 928, 931 (D.C. Cir. 2026); *see Gjoci*, 171 F.4th at 435.

At least at times, an intervening change in law can moot a claim. *See Samma v. Dep't of Def.*, 136 F.4th 1108, 1113 (D.C. Cir. 2025) (explaining that an agency's repeal of a regulation can moot a case); *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 840 (D.C. Cir. 1985) (recognizing that "a judicial decision [that] has changed the underlying law . . . can moot a case in the same fashion [as] legislative action repealing or amending a statute"). To be sure, a change in the law that undermines the merits of a claim does not necessarily implicate the court's jurisdiction; an intervening decision establishing binding precedent at odds with the plaintiff's theory of the case will generally pose a problem only on the merits. Here, however, the Supreme Court's decision in *NRSC* is different in nature; it did not change the law that the Court must apply on the merits but rather deprived the merits of the case of any legal significance, much as the repeal of a statute that a court was asked to interpret might do. Under the state of affairs in place when the DCCC's amended complaint was filed, the question whether joint-fundraising advertisements

were coordinated party expenditures under FECA was significant because FECA imposed limits on those expenditures. The DCCC—and the original party that requested the advisory opinion, DSCC—were concerned that the NRSC maintained a competitive advantage in elections because it used these so-called joint-fundraising advertisements to spend significantly more money in support of particular candidates than would be permitted under FECA's limits on coordinated party expenditures. *See* Dkt. 28 at 21–22 (Am. Compl. ¶ 61). But the result of the Court's decision in *NRSC* is that FECA's coordinated-party-expenditure limits are no longer enforceable—as if the relevant statutory provisions were repealed. That is precisely the sort of intervening development that can moot a previously viable challenge to an FEC decision about when and how those provisions apply. *See Gulf Oil Corp.*, 778 F.2d at 840 ("If intervening events that change the law can moot challenges to the validity of a statute or regulation, then *a fortiori* such events can moot challenges to *applications* of the provision.").

At least two of DCCC's three arguments for why the Court should set aside the FEC's Closeout Letter plainly no longer present live issues after the Supreme Court's decision. The DCCC's contention that the FEC failed to uphold FECA's coordinated-party-expenditure limits cannot form the basis of a live controversy after the Supreme Court's invalidation of those limits. Similarly, the DCCC's contention that the FEC's non-decision was "contrary to constitutional right[s]" because it "deprived [the] DCCC of safe harbor protection from enforcement actions against JFC-advertising in excess of FECA's limits in future elections," Dkt. 28 at 30–31 (Am. Compl. ¶ 97), has been rendered moot by the Supreme Court's decision. The same is true with respect to the DCCC's corresponding request for an injunction to prevent the FEC from enforcing the coordinated-party-expenditure limits against it. With respect to the FEC's alleged failure to uphold the limits, the Court cannot grant any relief that would redress an injury

stemming from the FEC's nonenforcement of FECA's coordinated-party-expenditure limits, since those limits are now unenforceable under binding Supreme Court precedent. And with respect to the DCCC's request for its own safe harbor, *NRSC* effectively granted DCCC the relief that it seeks. With the invalidation of FECA's limits, the DCCC may spend the same amounts on these joint-fundraising advertisements as the NRSC —whether or not the ads are coordinated party expenditures. That is, the Supreme Court's decision "allow[s] all political parties—including the DNC and RNC and the respective Senate and House campaign committees—to . . . coordinate more closely with their candidates." *NRSC*, 146 S. Ct. at 2428. A decision by this Court holding either that the NRSC has engaged in advertisements that violate the now-unenforceable coordinated-party-expenditure caps or that the DCCC is entitled to a safe harbor from enforcement of those now-unenforceable caps thus cannot provide any effectual relief.

Mootness disposes of the majority of the DCCC's claim, as the DCCC itself appears to concede. *See* Dkt. 57 at 10 (Tr. 10:2–9). Perhaps in recognition of the insurmountable jurisdictional hurdles that the DCCC would face if it continued to rely on the expenditure-limit theory on which its complaint initially focused, the DCCC in its supplemental briefing shifts course. It continues to press its request that the Court set aside the FEC's October 10, 2024, non-decision and declare that the advertisements described are coordinated party expenditures. *See* Dkt. 60 (DCCC Supp. Mem.). But the DCCC now focuses exclusively on a theory of injury that is unmoored from the request for an advisory opinion that the DSCC presented to the FEC and to which the DCCC has sought to secure an answer in this litigation.

The DCCC contends that it has standing to challenge the FEC's non-issuance of an advisory opinion and to obtain its requested relief based on an informational injury resulting from its competitor campaign committees' failure to report their joint-fundraising advertisements

as coordinated party expenditures under FECA's disclosure provisions. Because the Supreme Court's decision in *NRSC* did not alter FECA's reporting requirement—and, indeed, invokes disclosure requirements as "a much stronger anti-circumvention tool" and as a means of deterring actual corruption and the appearance of corruption, *NRSC*, 146 S. Ct. at 2421—the decision did not moot the DCCC's APA challenge, at least to the extent the DCCC's challenge focuses on disclosure. The question for the Court, then, is whether the NRSC's (and the NRCC's) failure to report that it has made coordinated expenditures on the ads at issue is sufficient to support the DCCC's standing to challenge the FEC's non-issuance of an advisory opinion about whether these ads are subject to FECA's coordinated-party-expenditure limits.

**B. Standing**

The DCCC contends that it continues to suffer an informational injury as a result of the FEC's non-issuance of an advisory opinion because the Commission's failure to categorize properly the NRSC's advertisements has deprived the DCCC of information to which it has a statutory entitlement. Dkt. 60 at 6–10 (DCCC Supp. Mem. at 1–5). And the DCCC maintains that this informational injury establishes its standing to seek both vacatur of the FEC's October 10, 2024, Closeout Letter and a declaratory judgment that the advertisements at issue constitute coordinated party expenditures within the meaning of FECA's disclosure provisions. *Id.* Although the DCCC may have suffered an injury-in-fact that might support Article III standing in an appropriate case, the Court concludes that the DCCC has not shown—and cannot show—that any such injury is traceable to the FEC's non-issuance of an advisory opinion about an entirely different question, nor that any such injury is redressable by vacatur of that non-decision. *See DCCC I*, 2024 WL 4650907, at *8–10.

To establish standing under Article III, a plaintiff must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff may establish Article III standing based on an informational injury "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Akins*, 524 U.S. at 21. To establish a concrete and particularized informational injury, a plaintiff must allege that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

Here, the DCCC alleges that it is suffering an informational injury because FECA's reporting requirements for coordinated party expenditures require the NRSC and other national committees to disclose certain details about their coordinated expenditures, and the DCCC's lack of access to these disclosures disadvantages the DCCC with respect to its spending strategy in competitive elections. Dkt. 28 at 28–29 (Am. Compl. ¶¶ 89–90); Dkt. 60 at 6–10 (DCCC Supp. Mem. at 1–5). Because the Court concludes that the DCCC has not satisfied the necessary elements of traceability and redressability, the Court need not decide whether the committee's allegations establish a cognizable informational injury, although the Court does not doubt that the failure to report information of which FECA requires disclosure could, in an appropriate case, support such an injury. *See Akins*, 524 U.S. at 21.

The traceability and redressability prongs of the standing analysis are closely related. Whereas traceability "requires the plaintiff to show that the injury was likely caused by the"

challenged action, redressability asks whether "the injury would likely be redressed by judicial relief." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025)(citation modified). In suits challenging agency action for authorizing or failing to prevent the injurious actions of third parties (such as a third party's failure to disclose helpful information), "traceability turns on the causal nexus between the agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and judicial relief." *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994). Unsurprisingly, although redressability may in certain cases "pose an independent bar" to standing, redressability typically follows causation because "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 & n.1 (2024).

The Court begins with the ground it tread in its previous decision denying the DCCC's motion for a preliminary injunction, which sought, at least temporarily, to set aside the October 10, 2024, Closeout Letter. *See DCCC I*, 2024 WL 4650907, at *6 ("At this stage of the litigation, the DCCC seeks only one form of preliminary relief: it asks the Court—at least temporarily—to set aside the FEC's response notifying the DSCC that the Commission was unable to approve an advisory opinion by the required affirmative vote of four members."). In rejecting the DCCC's request, the Court explained why vacatur of the non-decision to close out the advisory opinion request would not redress any informational injury the DCCC was suffering. As the Court noted, the October 10, 2024, Closeout Letter "takes no position on whether the funds at issue constitute contributions that are subject to the disclosure requirements." *Id.* at *10. And vacating that letter "would . . . have no legal bearing on the DCCC's alleged informational injury" because "[n]othing in the Court's order would require the

FEC to bring an enforcement action" against the NRSC for failure to comply with FECA's reporting obligations, nor would the Court's vacatur require the FEC to issue an advisory opinion reaching any particular substantive outcome. *Id.*

Nor, contrary to the DCCC's contentions, is this a circumstance in which vacatur would provide the DCCC relief by "affording the agency a new opportunity to issue a lawful [advisory opinion] that would help redress [the] DCCC's injuries." Dkt. 60 at 11 (DCCC Supp. Mem. at 6). When a plaintiff has been injured by a discretionary agency decision infected with legal error, the Supreme Court has instructed that traceability and redressability are not destroyed simply because the agency, despite the correction of its legal error, might later reach the same substantive conclusion for different reasons. *See Akins*, 524 U.S. at 25. Instead, the mere possibility that the agency might exercise its discretion differently on remand suffices to establish the latter two elements of standing. *Id.* But that principle is a poor fit where, as here, the challenged agency decision does not foreclose the DCCC—nor the actual requester, the DSCC—from returning to the agency with a new request for an advisory opinion on the question that the DCCC now asks the Court to adjudicate. And that fit is even shoddier when, as here, the question that the DCCC wants answered is not the same question that the DSCC posed to the FEC in 2024 and when, as here, intervening Supreme Court precedent has fundamentally reworked the law governing the question that the DSCC did pose. Vacatur of the Closeout Letter is thus unnecessary—and ineffectual—to clear aside a legally erroneous agency action for the purpose of allowing the agency another turn at the issue.

The *Akins* Court's view of redressability is also inapposite when, as here, the reason for the initial agency decision would be unaffected by a decision in the plaintiff's favor. The FEC's letter indicates that the sole reason for the FEC's non-issuance of the requested advisory opinion

was the agency's inability to achieve the "affirmative vote of four members." Dkt. 46 at 152 (AR 148) (citing 52 U.S.C. §§ 30106(c), 30107(a)(7)). Even if the Court were to set aside the FEC's Closeout Letter, the DCCC has not established that the vacatur would have any effect on the votes of the individual commissioners on remand; to the contrary, it verges on a fait accompli that, on remand, the FEC would simply point to the Supreme Court's decision in *NRSC* and issue an advisory opinion answering the DSCC's principal question in the affirmative: Yes, a joint-fundraising committee can finance the entire cost of the proposed television advertising because the political-party coordinated-expenditure limits are unconstitutional. Under those circumstances, there would be no reason for the agency to address the separate question, not raised by the DSCC's 2024 request, whether those expenditures should nonetheless be reported as coordinated expenditures. And, for similar reasons, the DCCC has failed to demonstrate that the reopening of DSCC's request for a safe harbor from enforcement of FECA's contribution limits would—or could—result in agency action requiring enforcement against the NRSC or other committees of FECA's reporting requirements in a manner that would remedy the DCCC's alleged informational injury.

These same considerations also undercut the DCCC's ability to satisfy the causation requirement for Article III standing based on its alleged informational injury. The DCCC bases its asserted injury on its inability to obtain information to which, the DCCC contends, it is statutorily entitled. *See* Dkt. 60 at 6–10 (DCCC Supp. Mem. at 1–5). But that is not the question that the DSCC posed to the FEC, nor the question that the Commission declined to resolve. True, as DCCC's counsel has pointed out, the question that it now poses—whether the ads constitute coordinated expenditures for purpose of FECA's reporting requirements—and the question that the DSCC posed—whether the ads constitute coordinated expenditures for

purposes of FECA's contribution limits—turn in part on the antecedent question of how to classify the described advertisements. *See* Dkt. 57 at 9–10 (Tr. 9:23–10:1). Article III causation, however, requires a nexus "between the injury and the conduct complained of," *Lujan*, 504 U.S. at 560, and, here, the conduct complained of is "[t]he FEC's failure to issue an advisory opinion" resolving the question posed by the DSCC, Dkt. 28 at 30 (Am. Compl. ¶ 97).

According to the DCCC, the FEC's issuance of the Closeout Letter violated the APA because the agency failed to "uphold FECA's plain contribution and party expenditure limits," misunderstood FECA, and "deprived [the] DCCC of safe harbor protection from enforcement actions against JFC-advertising in excess of FECA's limits." *Id.* at 30–31 (Am. Compl. ¶ 97). In other words, the DSCC sought an advisory opinion to ensure that FECA's coordinated party *expenditure limits* are applied in an even-handed manner, and the DCCC's complaint alleges that the FEC violated the APA by failing to answer that question. The DCCC asks the Court to ignore the disconnect between the conduct complained of, which focuses on expenditure limits, and the asserted injury, which focuses on the Act's separate reporting requirements. But it stretches traditional notions of Article III causation past the snapping point to posit that a third-party, who might have indirectly benefited from the safe-harbor rule, has standing to challenge the agency's failure to act, not because the agency should have issued an opinion resolving the question actually posed, but because had it done so, the agency's decision would likely have included reasoning that would likely have shed important light on a different question. Among other difficulties, that theory is too "attenuated" to satisfy Article III, *All. for Hippocratic Med.*, 602 U.S. at 383, and it would open the door to scores of challenges to administrative decisions, not because the plaintiff is aggrieved by the outcome of the agency action or inaction—that is,

"the conduct complained of"—but because the agency's reasoning (or failure to offer reasoning) might bear on different questions in the future.

The DCCC's inability to establish traceability between the FEC's Closeout Letter and the informational injury it currently asserts before the Court also forecloses its standing to seek a declaratory judgment that the joint-fundraising ads are subject to FECA's reporting requirements for coordinated party expenditures. *Contra* Dkt. 60 at 11–12 (DCCC Supp. Mem. at 6–7) (arguing that a declaratory judgment in DCCC's favor would provide effectual relief). Perhaps a judgment declaring that the joint-fundraising ads described constitute coordinated party expenditures would not suffer from the same redressability defect as the DCCC's request for vacatur given the possibility that a declaratory judgment would have preclusive effect. *See Haaland v. Brackeen*, 599 U.S. 255, 293 (2023). But the DCCC's claim for declaratory relief, like its request for vacatur, suffers from a fundamental misalignment between the agency action challenged and the DCCC's reason for challenging it, *i.e.*, its asserted injury. Even if the DCCC suffers some type of injury because the NRSC and other committees do not report their joint-fundraising expenditures as coordinated party expenditures, the DCCC's suggestion that the FEC's non-issuance of an advisory opinion about FECA's *contribution limits* caused that *informational injury* borders on incoherent.

The Supreme Court's and D.C. Circuit's informational-injury cases involve a typical sequence: a plaintiff seeks information from a government agency, the agency takes some action that denies the plaintiff access to that information, and the plaintiff sues, contending that the agency has deprived it of information to which it has a statutory right. *E.g.*, *Akins*, 524 U.S. at 16–18 (challenging the FEC's dismissal of a complaint asking the FEC "to order [a political organization] to make public the information that FECA demands of a 'political committee'");

*Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008) (challenging an FEC regulation adopting a definition of "coordinated communications" that excluded certain expenditures from required disclosure). For traceability, the key feature of the challenged agency action is that the action in some way denies the plaintiff access to the information sought—such as by the agency's own refusal to provide it, *Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989), the agency's refusal to order a third party to provide it, *Akins*, 524 U.S. at 16–18, or the agency's affirmative authorization of the information's nondisclosure, *Shays*, 528 U.S. at 923.

The necessary causal connection between the agency action and the informational injury is established by the agency's "affirmative" action refusing disclosure or authorizing nondisclosure. *DCCC I*, 2024 WL 4650907, at *8. A non-decision on a request for an advisory opinion that made no mention of disclosure requirements and that, instead, sought advice only about contribution limits, cannot be said to have *caused* an informational injury for purposes of Article III, even if a decision by the agency resolving the advisory opinion request might have included relevant reasoning.[1] *Cf. Telecomm'ns Rsch. & Action Ctr. v. FCC*, 917 F.2d 585, 588 (D.C. Cir. 1990) (holding that a party's "interest in the Commission's legal reasoning and its potential precedential effect does not by itself confer standing where, as here, it is 'uncoupled'

[1] To be sure, the fact that the DSCC sought an advisory opinion arguably implicates the FEC's reasoning to a greater degree than if the claim challenged a more typical adjudication for which the substantive outcome is of primary import. In the context of an advisory-opinion request, the question posed is, in one sense, how the agency reads FECA's provisions defining coordinated party expenditures and contributions, and that interpretation could affect the requester's later actions. But ultimately, the purpose of providing an advisory opinion is to tell the requester and other identically situated parties whether the *conduct* at issue is lawful. *See* 52 U.S.C. § 30108(a)(1) (providing that, upon "a complete written request concerning the application of [the] Act . . . with respect to a specific transaction or activity, . . . the Commission shall render a written advisory opinion *relating to such transaction or activity*" (emphasis added)). Here, the relevant conduct—*i.e.*, the relevant "transaction or activity"—involved the amounts that the DSCC could fund with respect to the joint-fundraising ads described, not whether the committee had to report expenditures on those ads under FECA's disclosure provisions.

from any injury in fact caused by the substance of the [agency's] adjudicatory action"); *Radiofone, Inc. v. FCC*, 759 F.2d 936, 938–39 (D.C. Cir. 1985) (separate opinion of Scalia, J.) (explaining that, to support Article III standing, an "injury must . . . arise from the particular activity which the agency adjudication has approved . . . and not from the mere precedential effect of the agency's rationale in later adjudications"). Absent that causal connection, the DCCC cannot establish its standing to challenge the FEC's non-decision based on its alleged informational injury.

The observation that the DCCC's informational-injury claim is unmoored from the agency action it purports to challenge bears on the merits of the DCCC's APA claim as well as the jurisdictional question whether the DCCC has standing to raise its APA claim. Ordinarily, the Court is bound by the principle that a federal court may not pass upon the merits of a claim until it has assured itself of its jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). But the Supreme Court has recognized a rare category of cases in which the question of subject-matter jurisdiction is so intertwined with the merits of a dispute that the court may decide them simultaneously. *See Brownback v. King*, 592 U.S. 209, 218 (2021); *see also Bolivarian Repub. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017). Here, the reasons that the DCCC's alleged informational injury does not establish its Article III standing to challenge the FEC's non-decision are the same reasons the Court doubts the APA provides a cause of action for a declaratory judgment of the kind the DCCC seeks, even assuming the FEC's Closeout Letter is a reviewable final agency action.

The APA sets up a particular "relationship between the agencies and the courts" under which federal courts are obligated to review actions actually taken by agencies for the reasons those agencies took them. *Callejo v. Resol. Tr. Corp.*, 17 F.3d 1497, 1500 (D.C. Cir. 1994); *see*

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Unlike in a "garden variety civil suit," a district court reviewing an APA challenge to an agency action "does not perform its normal role but instead sits as an appellate tribunal." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (citation modified). Despite the Court's responsibility to exercise its independent judgment in matters of statutory interpretation, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392–94 (2024), the Court is generally not permitted to exercise such judgment untethered from any agency action under review.

The APA "establishes a cause of action for those 'suffering legal wrong *because of agency action*, or adversely affected or aggrieved *by agency action*.'" *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (quoting 5 U.S.C. § 702) (emphases added). Where, as here, the plaintiff's injury is not caused by the challenged agency action, the plaintiff not only lacks standing but also cannot state an APA claim upon which relief can be granted. Because the Court concludes that the DCCC has not satisfied Article III's requirements for jurisdiction over its claim, the Court need not determine conclusively whether the DCCC has stated a cause of action under the APA. But the questions are essentially the same. For Article III purposes, the DCCC cannot challenge the FEC's failure to issue an advisory opinion resolving, even incidentally, a question that was not posed to the agency. And for purposes of the APA, the DCCC lacks a cause of action to challenge the agency's non-issuance of a decision based on a substantive disagreement with reasoning adopted by less than a majority of the six commissioners and seeking resolution of an issue never presented to the agency in the first instance.

## CONCLUSION

For the foregoing reasons, Defendant's and Intervenor-Defendant's Motions to Dismiss, Dkts. 32, 34, are hereby **GRANTED**, and Plaintiff's Motion for Summary Judgment, Dkt. 37, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 3, 2026